THE STATE OF KANSAS *ex rel.* JOHN H. WATSON v. NELSON COBB.

## Quo Warranto.

An information in the nature of a *Quo Warranto*, filed by the Attorney General on the relation of an individual, inquiring of the respondent, exercising the functions of an office by what authority he holds it, is practically instituted for the purpose of trying the right of the relator and of the respondent respectively to that office.

It is a general principle that the judiciary are elected. The exception to this rule is, that they are appointed to fill vacancy.

The elections in March and November of each year provided for in the Constitution, *held* to be "regular elections." The phrase "regular elections" used in Sec. 11, Art. 3 of the Constitution, defined to mean the next election held conformable to established rule or law.

The time for electing other portions of the judiciary, than Justices of the Peace, *determined* to be at the general election at the same time, as other District and State officers: namely, at the November election, and that the next *regular* election, is the one next occurring, at which the particular class of judicial officers is to be chosen.

Under the constitutional provision that "in case of vacancy in any judicial office, it shall be filled by appointment of the Governor until the next

The State ex rel. Watson v. Cobb.

*regular* election that shall occur more than thirty days after such vacancy shall have happened," the time for which an appointment to a judicial office is to run, is limited to the next *general* election occurring more than thirty days after the happening of the vacancy, at which election the particular class of judicial offices, to which the one made vacant belongs, might be filled by election.

The mode of filling such vacancy, after the appointment expires, is by election at the proper time, under Sec. 19, Art. 2, of the Constitution.

The effect of the provision in Sec. 13, Art. 3, of the Constitution, prohibiting Justices and Judges from holding any other office of profit or trust under the authority of the State or the United States, during the term of office for which they shall be elected, is to prevent the acceptance of any other office, whether emanating from the State or from another authority, by a Judge or Justice, the term of whose judicial office has not expired, and to render such acceptance void.

The provisions of that section do not prescribe rules by which the existence of a vacancy in any judicial office named, is to be ascertained, nor does that section provide for a vacancy.

After removal from, or resignation of office, the Justices and Judges named are still bound by the constitutional inhibition as individuals, until the expiration of the term for which they were elected.

The provisions of Sec. 13, Art. 3, compared with those of Sec. 5, Art. 2 and Sec. 10, Article 1, providing for filling vacancies in the offices of legislators and executives.

The law of the State is not changed by the want of power to follow its violation into another jurisdiction. It is within the province of the Supreme Court to declare what effect the acceptance of an office under the United States will have on the term of a judicial office of this State, and *held* that such acceptance by a judicial officer, does not of itself work a vacancy in the office.

An officer is one who is *lawfully* invested with an office, and can only be created by law.

A Deputy "Recruiting Commissioner" under James H. Lane is not an officer known to or recognized by either State or national law, and the appointment by a Recruiting Commissioner, of a Colonel in the volunteer service of the United States is without the shadow of warrant of law.

When the members of a regiment of volunteers in the United States service elected company officers, and these officers before receiving commissions elected a Colonel, *held* that it was a proceeding not known to the laws of Kansas.

The effect of mustering into the service of the United States, a person so elected Colonel could not be to make him an officer of the United States, nor could he become one by his own acts.

5

The State ex rel. Watson v. Cobb.

The letter of the Secretary of War, of November 5th, 1862, notifying Judge Ewing that he had been appointed by the President, Colonel, to rank as such from the 9th day of October, is conclusive evidence that the President of the United States had not appointed him Colonel prior to that date, and that he was not recognized by the Secretary or President, as Colonel prior to Oct. 9th.

Upon such an appointment of a Judge of the Supreme Court to a Colonelcy by the President, when such Judge made his written resignation of the Judgeship to the Governor on October 20th, 1862, which was received Nov. 28th, 1862, and whereupon on that day the Governor commissioned such person as such Colonel, *held* that a vacancy in the judicial office was thereby made, and that such vacancy was properly filled by the appointment by the Governor of a person to fill the same, who duly qualified as such Judge, and that such appointment was limited to the next regular election.

This was an information in the nature of a *Quo Warranto*, inquiring of the defendant by what authority he held and exercised the office of Chief Justice of the State.

The facts in the case were agreed to and are as follows :

Hon. Thomas Ewing, jr., was elected Chief Justice for a term of six years from the 29th of January, 1861, and entered upon the discharge of his official duties.

James H. Lane, was, by the Secretary of War, appointed a recruiting commissioner for the State of Kansas, with power to appoint assistants, and more than thirty days prior to the general election for the year 1862, Mr. Lane appointed Judge Ewing one of his assistants, and Judge Ewing at once entered actively into the work of raising recruits for the volunteer service.

Prior to the 15th of September, 1862, an election was held in what was known as the 11th regiment of Kansas Volunteers, and certain persons elected company officers; and prior to the same date said company officers elected Judge Ewing Colonel of said regiment.

On the 13th of September, 1862, Mr. Lane, by letter of that date, appointed Judge Ewing Colonel of that regiment. (A copy of this letter is before the Court.)

On the 15th of September, 1862, Judge Ewing was, by the mustering officer for the District of Kansas, (upon the

letter above referred to and its endorsements) mustered into the service of the United States, with the rank of Colonel of said regiment. He thereupon assumed command of said regiment, and was recognized as a Colonel by the officers of the District of Kansas, and the army of the Frontier.

From the facts as above stated, Judge Ewing derived all the authority or right which he had to exercise the office of Colonel prior to the 18th of November, 1862.

At a general State election, held on the 4th of November, 1862, the relator received a majority of all the votes cast for a Chief Justice.

The votes for Chief Justice were not canvassed until the 24th of January, 1863, at which time, however, said votes were canvassed, and the relator declared elected to the office of Chief Justice.

There was no proclamation that a Chief Justice was to be elected at said election.

Judge Ewing, on the 20th of October, 1862, sent a written resignation of the office of Chief Justice to Hon. Charles Robinson, the Governor of Kansas, which was received on the 28th of December, 1862.

On the 28th of December, 1862, Gov. Robinson appointed and commissioned Nelson Cobb as Chief Justice to fill the vacancy occasioned by the retirement of Judge Ewing, and thereafter, on the fifth day of January, 1863, Judge Cobb took the oath of office and entered upon the discharge of his official duties.

On the 5th of November, 1862, a letter was addressed to Judge Ewing by the Secretary of War, of which the following is a copy:

"WAR DEPARTMENT,
WASHINGTON, November 5th, 1862.

*Sir:* You are hereby informed that the President of the United States has appointed you Col. of the 11th Kansas Volunteers, in the service of the United States, to rank as

such from the ninth day of October, one thousand eight hundred and sixty-two.

"Immediately on receipt hereof, please communicate to this Department, through the Adjutant General of the army, your acceptance or non-acceptance; and with your letter of acceptance, return the oath herewith enclosed, properly filled up, subscribed and attested, and insert your age, birth-place, and the State of which you are a permanent resident.

"You will report for duty to

"(Signed)                    . EDWIN M. STANTON,
                                          Secretary of War.

Col. Thomas Ewing, jr., 11th Regiment Kansas Vols."

*Elmore & Martin*, for relator.

*Stinson & Havens* and *N. Cobb* in person, for respondent.

This case was submitted on briefs.

*Elmore & Martin*, for relator, submitted:

The term "next regular election" in Sec. 11, Art. 3., Constitution, means the first election which is held in pursuance of law more than thirty days after the vacancy occurs, (see Webster). The term "general election" in Sec. 2, Art. 4, Constitution, means to draw a distinction between the state and township elections. The election in November is not only a general election within the meaning of Sec. 2, Art. 4, but also is a regular election under the provision of Sec. 11, Art. 3, of the Constitution. The election in November is regular. It is held under the provision of the constitution—the highest law of the land—and it will not be contended for a moment by any one that an election held under the provision of the constitution is not regular but is general also. But we contend that regular and general elections have received a

construction by the State Government as stated above. Mr. Lee was elected Judge in the 2d District under the Wyandott Constitution. He resigned and the Governor appointed Mr. Horton, Judge. At the next election (general in November), Mr. Horton was elected Judge, and is discharging the duties of the office. The same in the case of Judge Leonard. He resigned; the Governor appointed Mr. Ruggles, and at the next election Mr. Ruggles was elected Judge. If the position contended for by the respondent is correct in both of the instances cited, Judges Horton and Ruggles would be guilty of usurpation of office—they holding by virtue of their election and not by executive appointment—even under color of law they would not be Judges *de facto*, their acts would not only be voidable, but absolutely void. Public policy, if nothing else, would imperatively demand that this rule having been adopted and acquiesced in by the executive, legislative and political branch of the Government, should be sustained by the Judiciary.

We insist that the office of Chief Justice of Supreme Court of the State of Kansas, was vacated more than thirty days prior to the election in November, 1862.

*First.* By Judge Ewing accepting of the position of recruiting officer in the army of the United States.

*Second.* By his election and acceptance of the position of Colonel of the 11th Regiment Kansas Volunteers.

*Third.* By being mustered into the military service of the United States.

Each of these positions are inconsistent and incompatible with the duties of Chief Justice. And the law presumes that whenever an officer accepts of another office or takes upon himself the duties of another office incompatible with the first, it is a resignation of the former. We insist that Sec. 13, Art. 3d, Constitution, in connection with the well-known principles of the common law, vacates the prior office—*See* 6, *Bacon Abridgment*, *pa-*

*ges* 35-37, *Angel & Ames* 255-256. And the additional fact that Judge Ewing abandoned the duties of the office of Chief Justice and accepting and entering on the discharge of the duties of recruiting officer—of Colonel of the 11th Reg. K. Vol., being mustered into the military service of the United States. (*See Sec.* 11, *page* 251 *Angel & Ames ;* 6 *Bacon Abridgment* 35 *to* 37 *; Angel & Ames* 255 *to* 256 *; Hill* 1.)

It was well known to the Government of the State of Kansas, that Judge Ewing had accepted the position of Recruiting Commissioner—was elected Colonel of the 11th Reg. K. Vol. and was sworn into the military service of the State,—all of this prior to the 15th of September, 1862. The Government of the State of Kansas acquiesced in this. Judge Ewing thereby resigned the office of Chief Justice, and the State of Kansas by the acts of its Governor accepted his resignation by acquiescing in the acts of Judge Ewing. (*See Angel & Ames, Sec.* 11, *page* 254.)

It is immaterial so far as the rights of Watson are concerned whether the Government of the State of Kansas considered the office of Chief Justice vacant or not, if in truth and in fact it was vacant prior to thirty days before the election, and Watson was elected, then he has a right to the emoluments of the office which the Government of Kansas cannot deprive him of. A commission does not confer a right on the holder to fill the office, it is nothing more than evidence *prima facie* of the right of the holder to the office, and to receive the emoluments thereof. No commission issued to Judge Ewing, Judge Kingman, Judge Bailey, or to any of the judicial officers under our law. The right of the office depends on something higher than a commission—on the majority of the votes under our law, and the discharge of the duties of the office, and an acquiescence therein by the Government. All of this was done in the case of Judge Ewing. It is admitted that

Judge Ewing discharged the duties of Colonel of the 11th Regiment and Recruiting Commissioner more than thirty days prior to the election; but that as no commission issued, his acts were illegal and void. Is this position sound? We think not. If Col. Ewing had been taken prisoner would he not have been entitled to have been treated as prisoner of war, and to have received the treatment of an officer of the rank of Colonel? Unquestionably! He was so treated by the Government of the United States and the army of the Frontier.

*Stinson & Havens* for respondent, submitted:

It is claimed for the relator:

*First.* That Judge Ewing, more than thirty days prior to the general election of 1862, accepted and held an office under the authority of the United States, and that such acceptance and holding was, under the Constitution of this State, a vacation of the office of Chief Justice.

*Second.* That the duties of the office, which he accepted and held under the United States, were so incompatible with those of Chief Justice, as to make the acceptance and holding of the former office an absolute vacation of the latter.

*Third.* That a vacancy having thus occurred under the constitution and laws of the State, it should have been filled at the general election in 1862, and as the relator received and had a majority of all the votes cast at such election for Chief Justice, he is entitled to the assistance of this Court to oust the present incumbent and establish himself in the office.

Although technically this is a proceeding between the State and the present incumbent, yet practically, under the provisions of our statute, it is instituted for the purpose of trying the title to this office between the relator and the respondent.

It will be conceded that, unless under the facts and the law the relator can make good his title, then the appointment and holding of the incumbent are legal.

It is in this view that it is proposed to examine the case on the part of the incumbent.

Sec. 13, Art. 3, of the Constitution, contains the following: " * * * And said Justices and Judges shall receive no fees or perquisites, *nor hold any other* office of profit or trust under the authority of the State, or the United States, during the term of office for which said Justices and Judges shall be elected. * * * * "

*First.* What was intended by this provision? Manifestly, it was not merely to declare that any other office was incompatible with the existence of a vacancy in any of the judicial offices, or to prescribe rules by which the existence of a vacancy in any of the judicial offices named might be determined. Even after a removal from, or resignation of office, the justices and judges named are still plainly and unequivocally bound by the constitutional inhibition until the expiration of the term for which they were, or may be, elected. The intent with which this provision was inserted into our constitution, and adopted, was that our high judicial officers might be removed as far as possible, from the temptation to use the power and influence of their positions unworthily for their advancement; to prevent their minds from being distracted from their legitimate duties by ambitious hopes and striving for place; to raise them above those political and partisan contests so unbecoming the expected purity, impartiality and calmness of the judicial character. Its effect is to prevent the acceptance of any other office, by a person, the term of whose judicial office has not expired, and to render such acceptance void. Compare this provision with that in regard to members of the Legislature, in Sec. 5 of Art. 11, as follows:

" No member of Congress or officer of the United States, shall be eligible to a seat in the Legislature. If any per-

The State ex rel. Watson v. Cobb.

son, after his election to the Legislature, be elected or appointed to any office under the United States, his acceptance thereof shall vacate his seat."

Or with regard to executive officers, in Sec. 10 of Art. 1, as follows:

"No member of Congress or officer of the State or of the United States, shall hold the office of Governor, except as herein provided."

If a member of the Legislature be appointed to and accept any office under the United States, such appointment and acceptance vacates his seat in the Legislature. If the Governor of the State, while in office, be elected as one of the Justices of the Supreme Court, his acceptance of the latter position would vacate the former; but if one of the Justices of the Supreme Court should be electedGovernor, the Courts would declare him ineligible to the latter office, or, if he had intruded into the office, would oust him by judicial proceedings. In such a case, in proceeding against such person for any act done by him in his assumed official character, the showing that he was elected to and was acting in that office would constitute no defence, because the constitution had absolutely prohibited him from holding that office, and such a defense would be based upon a clear violation of the paramount law of the State. His title and right to the office of justice would not be directly affected by his acceptance of the other office. He would still remain in his judicial office, because the acceptance of the other office would be illegal, void, and of no effect. The ineligibility of "such justices and judges" attaches to them as individuals, and not merely within offices.

*Second.* But it may be contended that, while the position here taken is tenable when both offices eminate from, and are under the control of the same government and authority; yet, to maintain this doctrine, when the judicial officer has accepted office under another government —an office over which the State nor its tribunals have any

control, would be to render nugatory this constitutional inhibition. The qualifications of officers of the United States, their eligibility, the tenure of their offices, are all matters over which the State of Kansas has, as a government, no control; and it would be idle for the State to regard the acceptance by one of its judges of a United States office as void, when the government of the United States permits him to perform its duties and receive its emoluments. By this acceptance, the constitution has been violated; but it is a violation the fruits of which cannot be reached by State Courts or State laws. Violation of law by an officer, or misconduct in office, do not of themselves vacate the office, although they may be good causes for removal by impeachment or by arrest. Taking fees is prohibited to judges; yet the taking of a fee by a judge would not vacate office, while it might be good ground for his removal.

Thus, then, we claim, that this constitutional provision does not affect the question of a vacancy, even if, from the facts, the Court should find that Judge Ewing did accept an office under the United States, more than thirty days prior to the general election of 1862.

*Third.* The relator's claim is based upon the existence of a vacancy in the office at the time above indicated. His case is not aided by showing a state of facts which would warrant the removal of Judge Ewing by proceedings similar to those in this case. This inquiry is not directed to ascertaining by what right Judge Ewing held the office, but it is simply: Did he hold the office at that time? It is conceded that he had been its rightful incumbent, and that his official term had not expired; but it will be claimed that he had accepted an office incompatible with that of Chief Justice, and that this acceptance, by its own force, operated to remove him from his former position. Conceding, for the purpose of this branch of the case, that he did accept the office under the United States, and that this

office was incompatible with that of Chief Justice, we submit:

1st. That this office could not be considered vacant, except through the death or resignation, express or *implied*, of Judge Ewing, or by his removal by the judgment of some competent tribunal. That so long as there was in him sufficient " color of office " to render his official acts valid as the acts of an officer *de facto*, the office was not vacant within the meaning of the constitution. Suppose Judge Ewing, under the facts here stated, had, on the 10th day of October, 1863, done any official act as Chief Justice, could it be contended that the facts here stated rendered that act a nullity? If not, it would be because he was by some color of right, holding and filling the office—a state of facts hardly consistent with a vacancy.

2d. Judge Ewing's resignation on the 20th of October, 1863, shows that there was no concurrence on his part in any resignation, express or implied, prior to that time.

3d. It has sometime been broadly stated, that, if a person holding one office accept another, the duties of which are incompatible with the first, such an acceptance is an implied resignation of the first, and at once and of its own force vacates it. The soundness of this doctrine, as applied to the cases in which it has been enunciated, it is not proposed to question; but in this, and it is not unfrequently the case, a principle applicable only to a particular class of cases, has been accepted as a general one, from which there are no exceptions. This doctrine has its origin in municipal and private corporations; and in all the adjudged cases in which it has been applied, the offices have been in the same body corporate, as will be seen by reference to the cases cited in Angell on Corporations. *Sec.* 434, (*Note*), and in cases where the incompatibility consisted in the fact that one officer was the adviser of the other, or the one was in some other way dependent upon

the other. This may well be. The officer has before him the fact that he cannot hold both offices and so has the corporation. With this knowledge the corporation elects him, manifesting its willingness to receive his resignation of his former office, and he accepts. So it might be, even in regard to two incompatible offices, both under the State government, although this doctrine has never been carried beyond corporations in any of the adjudged cases. In the case of the *People* v. *Carricue* (2 *Hill, N. Y.*, 93,) there is a dictum to this effect; but the question was in no way involved in the determination of the case at bar. The resignation, when so implied, is implied from the mutuality of knowledge and acts on the part of the officer and the power from which the office eminates. In the note to the section of Angell on Corporations, above cited, these words occur: "This (acceptance of incompatible office) is an absolute determination of the original office, and leaves *no shadow of title* to the possessor." If this proposition be true in this case, in the view in which we are now considering it, then, clearly, any act of Judge Ewing as Chief Justice, after his supposed acceptance of the other office, would have been simply void, as it takes something more than "shadow of title," to constitute an office *de facto*. The State did not attempt to treat the office as vacant until after the formal, written resignation of Judge Ewing. There was not, on the part of the State, in this case, that express or implied acquiescence in the acceptance of the incompatible office, which is manifested when both offices are the gift of the same body politic or corporation. If Judge Ewing had accepted the office of Colonel, and before he had notified the officers of the State of his acceptance, an application had been made to him to act upon some matter within his jurisdiction as Chief Justice at Chambers, and he had criminally refused, or neglected to entertain or consider the matter, in proceeding against him for such neglect or refusal, could he defend himself by

showing merely such a resignation as is implied in his acceptance of the Colonelcy? Would not the State have the right to treat him as Chief Justice, at least until notified of those facts from which the law, under certain circumstances, might presume a resignation?

4th. Public policy would seem clearly to forbid the application of the doctrine under discussion to such a case as the present. A judge might accept an office under the United States, without communicating either legal or actual notice to the people or officers of the State. The acceptance of the office, it is claimed, vacates the judgeship. Ten votes for a successor would be as conclusive as ten thousand, provided they were a majority, thus the door would be opened for the grossest frauds, as the voting would be confined to such persons as might receive notice of the facts from the judge. There can, of course, be no pretence, in this case, of any such practice; but it is for the Court, if possible, in deciding the general principles which shall control cases like the present to guard against the occurrence of such abuses. Had there been a judgment of ouster against Judge Ewing, or even if the State had in any way asserted its right to fill the office with another incumbent, the case might be different. But to assume that a judge can by an act, which, as between the State and himself, is known only to him, absolutely vacate his office, so as to render the election of his successor valid and legal, and that such election can be held without any legal or actual notice of such vacancy or election, is to place it in his power to dictate, and practically appoint his successor.

"An office is a right to exercise a public function, or employment, and to take the fees and emoluments belonging to it."

An office, in this country, can only be created by law.

A deputy recruiting commissioner, under James H. Lane, is not an officer known to or recognized by either state or national laws.

*Fourth.* The forces raised in Kansas in 1862, of which the 11th Regiment of Kansas Volunteers, were recruited exclusively under the laws and by the authority of the government of the United States, but more especially in accordance with an act of Congress, entitled "*An act to authorize the raising of volunteers to aid in enforcing the laws and protecting public property,*" approved July 22d, 1861. By the second section of this act, it is provided, that "The Governors of States furnishing volunteers under this act, shall commission the field, staff and company officers requisite for said volunteers;" but if the State authorities refuse to act, then the President is authorized "to commission the proper field, staff and company officers."

1st. This regiment was not raised under, or in conformity with the militia law of this State; and, as there is no provision in the laws of the United States authorizing an election of field and company officers, except in case of vacancies, we may at the outset dismiss the pretended election by the pretended company officers as a mere nullity.

2d. The appointment by James H. Lane, "recruiting commissioner," of a Colonel in the volunteer service of the United States, is without the shadow of warrant of law. His authority in the premises is derived solely from a letter emanating from the Secretary of War, and whatever power such a letter might confer, it surely could not override the plain provisions of the act of Congress above referred to.

3d. The effect of mustering Judge Ewing into the service of the United States could not be to make him an officer of the United States. If so, it would be in the power of every mustering officer to create officers without the intervention, and contrary to the wishes of the President, or of any other legally constituted appointing power.

4th. The provision of law that the President or Governor shall "commission" the officers named, carries

with it, of necessity, the power of appointment—the commissioning and the appointment are one and the same act. In the case of *Mabury* v. *Madison* (1 *Cranch*, 137), the Supreme Court of the United States, say :

"If an appointment was to be evidenced by any act, other than the commission, the performance of such public act would create the officer; and if he was not removable at the will of the President, would either give him a right to his commission, or enable him to perform the duties without it.    *    *    *    *    *    *    *

"This is an appointment made by the President, by and with the advice and consent of the Senate, and is evidenced by no act but the commission itself. In such a case, therefore, the commission and the appointment seem inseparable."    *    *    *    *

At any time prior to the actual commissioning, *i. e.*, signing and sealing the commission, the President or the Governor might re-consider their previously formed intention and refuse to execute the commission, and as the only method of appointment prescribed or recognized by the law is by commission, the appointment would fail.

*Fifth.* The acts of Judge Ewing and the military officers of the United States, must have been sufficient to constitute him an "officer" in the office of Colonel, or they do not effect this case. An officer is defined as "He who is lawfully invested with an office." Judge Ewing could not accept an office which was not tendered to him by some authority having the legal right to make such tender. He could not become an officer in contemplation of law by his own acts or upon his own motion. If he accepted this office, and became an officer in it, he was legally entitled to hold and enjoy it. Yet, even after the appointment by Mr. Lane and the mustering in of Judge Ewing, and after he had entered upon the discharge of his military duties, if the Governor of Kansas had exercised the power conferred upon him by law, the person so holding the commission would have been clearly entitled to the office.

*Sixth.* If the evidence upon this question closed with the admission of the election, appointment and mustering in of Judge Ewing as Colonel, it perhaps might be claimed that it raised a presumption of acquiescence on the part of the government of the United States; but any presumption is conclusively rebutted by the letter of the Secretary of War. If Judge Ewing was an officer of the United States prior to the 5th day of November or the 9th day of October, 1862, then the appointment by the President was a mere nullity. The letter is conclusive evidence of the fact, that the President, by no act of his, had appointed Judge Ewing, Colonel, prior to the 5th of November, and is further conclusive of the fact, that neither the President or the War Department intended to recognize him as Colonel, prior to the 9th day of October.

*Seventh.* Conceding that the facts are sufficient to make Judge Ewing's acts as Colonel the acts of an officer *de facto*; this, it is claimed, in no way affects the case at bar. In proceeding directly against him to oust him from office, he might be estopped from denying that he was Colonel; or, in the investigation of any acts done by him in that capacity, it would be sufficient to show that he was such officer *de facto;* but here the policy of the law does not interpose any such estoppel, and the principles upon which it is based do not apply. This proceeding is not against Judge Ewing to try his title to the office of Chief Justice at a particular date; so that the principle, which would prevent him from defending himself by showing that his assumption of the office of Colonel was wrongful, neither is it a case where rights have grown up in third persons by reason of his acts as Colonel. In such cases the policy of the law forbids an inquiry as to what, in this case, is the real and only question, which is: What effect did these acts have, not upon the rights of the relator or the incumbent, but upon the State and the office of Chief Justice?

*Eighth.* The office of Colonel in the volunteer service of the United States has been herein noted as an " office

of profit or trust, under the authority of the United States." If, however, as has been sometimes contended, it should be held to be an office under the State, there is no evidence of any appointment or recognition of Judge Ewing as Colonel, on the part of the authorities of the State, up to the time when his commission was signed by Governor Robinson.

V. It is not proposed to raise any point against the regularity of Mr. Watson's election, upon the ground of the absence of a proclamation that an election would be held for Justice, except so far as such absence illustrates the evils to which the construction of the law of this case, as claimed by the relator, must inevitably lead. It is not insisted that the mere neglect of an officer to issue a proclamation for an election, would render such election nugatory and invalid, especially when the constitution and law fix the term of office and the time of the election. In this case, however, the constitutional term had not expired, and the right to hold an election, if any such existed, was dependent upon facts, of the existence of which there was no means of communicating official knowledge to any officer of the State, nor is there any evidence of actual or constructive notice in this case, so that it was not by the neglect of any officer that the people were not warned of the election in due form of law; but, under the circumstances, such warning could not have been given—no officer had the requisite data upon which to act in the premises. It is the duty of the Court, in settling the important questions here presented, to give due weight to these considerations of public policy; not for the purpose of overriding the law, but to arrive at a correct appreciation of the objects intended to be attained by the law-making power.

Believing, then, that there was no vacancy, within the meaning of the constitution, in the office of Chief Justice, more than thirty days prior to the general election of 1862,

that such vacancy did afterwards happen, and that Judge Cobb was appointed by the Governor of the State to fill said office, we claim that he rightfully and legally "holds and enjoys" said office.

*By the Court*, KINGMAN J.

This is an information in the nature of a *quo-warranto* filed by the Attorney General of the State, upon the relation of John H. Watson, inquiring of the respondent, Nelson Cobb, by what authority he holds and exercises the office of Chief Justice of this State.

The facts are agreed upon, and are as follows :

Thomas Ewing, jr., was duly elected Chief Justice for six years, from January 29th, 1861, and having been commissioned and sworn in, entered upon the duties of his office.

James H. Lane, (a senator of the United States from the State of Kansas,) was on the —— day of ——, 1862, appointed by the Secretary of War, a Recruiting Commissioner.

On the —— day of ——, 1862, and more than thirty days prior to the general election of 1862, said Lane appointed Thomas Ewing, jr., an assistant recruiting commissioner, and said Ewing immediately and more than thirty days prior to such election, entered actively upon the work of raising recruits for the volunteer service of the United States.

The members of the 11th Regiment Kansas Volunteers, prior to the 15th of September, held an election, and certain persons were voted for by the members of said regiment, and those persons receiving the highest number of votes for the respective offices, were declared elected. In this way, said regiment elected its company officers. Afterwards, the persons so claimed to be elected company officers, voted for a colonel, and Thomas Ewing, jr., received the highest number of votes for that office, and the per-

sons so elected company officers afterwards received commissions from the Governor of Kansas, according to their rank and grade. On the 15th of September, 1862, Lane, by letter of that date, appointed Ewing colonel of said regiment, and Judge Ewing immediately thereupon, entered upon the duties of the office of colonel of the 11th Regiment Kansas Volunteers.

And the same day, Ewing, was by the mustering officer for the District of Kansas, upon said letter of appointment and the endorsements thereon, mustered into the service of the United States as colonel of said regiment, and at once entered upon the discharge of the duties of that office, and was recognized as colonel by the officers of the District of Kansas, and the army of the frontier.

Judge Ewing did not resign the office of Chief Justice, (unless the facts herein stated constitute a resignation,) until the 20th day of October, 1862, and on the 28th day of November, 1862, his written resignation was received by Gov. Robinson.

No commission as colonel was issued to Judge Ewing until Nov. 28, 1862, nor had he any authority to act as colonel other than his election as aforesaid, and his appointment by Lane, and his being mustered into the United States service as colonel of the 11th Regiment of Kansas Volunteers.

On the 5th day of November, 1862, a letter was addressed to Col. Ewing by Edwin M. Stanton, Secretary of War, stating that Ewing had been by the President appointed colonel of the said 11th regiment, to rank as such from the 9th day of November, 1862.

At the general election in 1862, John H. Watson received *more than a majority* of all the votes cast for Chief Justice.

The Board of State Canvassers which assembled on the 22d day of December, 1862, did not canvass the votes for Chief Justice, but the State officers elected in 1862, who.

by law compose the Board of Canvassers, did on the 24th of January with all the forms prescribed by the statute, canvass the votes and declare Watson elected Chief Justice.

There was no proclamation in regard to an election for Chief Justice to be held on said 4th day of November, 1862.

On the 28th of December, 1862, Gov. Robinson appointed and commissioned Nelson Cobb as Chief Justice in due form of law, to fill the vacancy occasioned by the retirement of Judge Ewing. Afterwards Cobb qualified by taking the oath of office, has ever since and still is, acting as Chief Justice.

The commission issued to Judge Ewing as colonel as aforesaid, was dated November the 28th, by which he was to rank as colonel as aforesaid, from Sept. 1st, 1862.

Upon this statement of facts, the relator claims,

1st. That more than thirty days prior to the general election in 1862, Mr. Ewing who was the Chief Justice, and whose term was unexpired, accepted and held an office under the authority of the United States, and that such acceptance and holding was under the constitution of this State, a vacation of the office of Chief Justice.

2d. That a vacancy having thus occurred under the constitution and laws of this State, it should have been filled at the general election in 1862, and as the relator received a majority of all the votes cast at such election for Chief Justice, that therefore he is entitled to the office and to the interposition of this Court to oust the respondent.

The respondent holds the office by virtue of an appointment by the governor of the State, and claims

1st. That without regard to the time when the vacancy occurred there is no constitutional authority for holding an election to fill such vacancy,—that it could be filled only by appointment by the governor, and

2d. That the vacancy did not occur more than thirty days prior to the general election of 1862, and that there-

fore under any construction of the constitution, no election could be held for filling the office.

Although technically, this is a proceeding between the State and the respondent, yet practically, under the provisions of our statute, it is instituted for the purpose of trying the right to this office between the relator and the respondent, and unless under the facts and the law, the relator can make good his title, then he is not entitled to the judgment of this Court in his favor.

The record and the argument present two questions for consideration:

1st.   Is there any constitutional and legal authority for filling a vacancy in a judicial office by election, and

2d.   Did a vacancy occur in the office of Chief Justice more than thirty days prior to the general election in 1862.

If either of these propositions is answered in the negative, then the relator is not entitled to the office he claims.

If it should appear that there is no sufficient authority for filling a vacancy in a judicial office by election, then any inquiry as to the time when the vacancy occurred in this case, will be unnecessary.   We will therefore first see what is the law for filling vacancies in judicial offices.

The constitution provides for the filling of its judicial offices by election, and that "in case of vacancy in any judicial office, it shall be filled by appointment of the governor until the next regular election that shall occur more than thirty days after such vacancy shall have happened." *Sec.* 11, *Art.* 3.   The general principle is that the judiciary are elective.   The exception made to meet possible necessities, is by appointment to fill vacancies, but that appointment is expressly limited and must expire at the next regular election that occurs more than thirty days after the vacancy shall have happened.   Thus showing that it was the intention to limit the exceptional method of selecting the judiciary so far as was consistent with a deliberate exercise of the mode of filling the office by the usual mode of election.

It is claimed that the term *regular election* means the election held at the proper time for filling the next regular term of the particular office vacant.

If this is the meaning of that phrase in that connection, then it is an end to this controversy, for then the right of the respondent to hold the office under the appointment of the governor until the expiration of the full term for which Mr. Ewing was elected can not be doubted.

The term regular election is used in the constitution in this instance only. The general election is defined by Sec. 2, Art. 4, as the annual fall- election, and it is the use of the word *regular* instead of *general* that has given rise to most of the difficulty on this point.

The constitution has provided that one class of its judiciary—that is, justices of the peace shall be elected at the township elections in March by declaring justices of the peace to be township officers. No definite time is fixed for the election of the other portions of the judiciary, but it may well be inferred that it was intended they should be elected at the general election at the same time as other district and State officers. This is the view taken by the Legislature, and they have provided accordingly in the law.

To have used the word general in designating the election at which the gubernatorial appointment should expire, would have produced confusion by making the appointee to the office of justice of the peace hold till the November election while his successor could only be elected at the March election. This inconvenience was avoided by using the word regular instead of general, which had received a definite meaning. The word regular means conformable to an established rule, law, or principle, and the exact literal signification of the phrase "next regular election," is the next election held conformable to established rule or law.

The constitution provides for two such elections in each year,—one in March and one in November, Each of them

are regular elections because each is in conformity with the established rule laid down in the constitution. At the March election justices of the peace are to be chosen; at the November election judges of the district and justices of the Supreme Court are to be chosen. So that the next regular election is the one next occurring at which the particular class of judicial officers is to be chosen.

To give to the clause the construction claimed by the respondent, would be not only violently to change the whole structure of the section by making the word regular describe the term for which the officer was elected instead of the election at which the appointment expires by limitation, but it makes all that part of the section after the words regular election, meaningless, for the words "that shall occur more than thirty days after such vacancy shall have happened," neither add to nor limit the meaning of the clause should it receive the interpretation claimed.

It is one of the fundamental canons of interpretation that if possible a law shall be so construed as to give to each part some meaning, and this rule would be violated by giving the clause such a construction as would give no meaning to the latter part of it.

By giving however to the word regular its just meaning as above indicated, the last part of the clause has full and due weight, by extending the limitation not to the next regular election only, but to the one that shall occur more than thirty days after the vacancy shall have happened.

We think it plain that the true meaning of this clause of the section is to limit the time for which the appointment of the governor is to run, which in the case before us is to the next general election, occurring more than thirty days after the happening of the vacancy.

In this we are happy to agree with the executive and legislative branches of the government, each of which have acted on the same construction of the clause we have given to it.

The constitution makes no positive provision for an election to fill a vacancy in a judicial office, but as we have seen, it is expressly limited to the time for which the governor can appoint. The mode of filling the vacancy then after the appointment expires, will be found by implication, or looked for in such legislation as may have been based on Section 19, Article 2d of the constitution, which gives the legislature power to provide for the filling of all vacancies not otherwise provided for in the constitution. By virtue of this power the Legislature has provided that such vacancies shall be filled at the proper time, by election. *Sec.* 39, *page* 500, *Comp. Laws.*

This brings us to the second question.

Did a vacancy occur in the office of Chief Justice more than thirty days prior to the general election in 1862?

To determine this question requires an examination of the constitutional provisions affecting the case. The last clause of Section 13, Article 3 of the constitution, is as follows:

"And such justices or judges shall receive no fees or perquisites, nor hold any other office of profit or trust under the authority of the State or United States, during the term of office for which said justices and judges shall be elected, nor practice law in any of the courts of the State during their continuance in office."

It is clear that it is not the intention of this provision to prescribe rules by which the existence of a vacancy in any of the judicial offices named is to be ascertained. Even after a removal from or resignation of office, the justices and judges named are still plainly and unequivocally bound by the constitutional inhibition until the expiration of the term for which they were elected. The disqualification attaches to the individual and not to the incumbent of the office. The object sought to be accomplished by this provision, is that our high judicial officers may be removed as far as possible from the temptation to use the power and

influence of their positions and authority for their own advancement.	To prevent their minds from being distracted from their legitimate duties by ambitious hopes and struggles for preferment, to raise them above those political and partisan contests so unbecoming the desired purity, impartiality and calmness of the judicial character.	Its effect is to prevent the acceptance of any other office by a judge or justice the term of whose judicial office has not expired, and to render such acceptance void.	The entire scope and object of this provision are so widely different from those applicable to members of the Legislature or to executive offices as to clearly show by a comparison.	Section 5, Article 2, uses this language :

"If any person after his election to the Legislature be elected or appointed to any office under the United States, his acceptance thereof shall vacate his seat."

Section 10, Article 1, is as follows :

"No member of Congress or officer of the State or of the United States, shall hold the office of governor except as herein provided."

One can not examine these several provisions without perceiving at once that the purpose of the judiciary clause is to prevent a vacancy by the acceptance or holding of any other office during the term for which the incumbent was elected, while the purpose of the provision for the Legislative and executive offices is to create a vacancy in case of their acceptance of certain specified classes of offices.

If the governor of the State while in office be elected as one of the justices of the Supreme Court, his acceptance of the latter position would vacate at once the former; but if one of the justices of the Supreme Court should be elected governor for a term, any part of which was included in the term for which he was elected justice, he would be held ineligible to the office of governor, and if he should intrude into the office, would be subject to ouster by judicial proceedings.	In such a case in proceeding against such per-

son, the showing that he was elected to and was acting in that office would be no defence, because the constitution absolutely prohibits him from holding that office, and the attempted defense would be based upon a palpable violation of a fundamental law of the State.

His title and right to the office of justice would not be directly affected by his acceptance of the office of governor. He would still remain in his judicial office because the acceptance of the other office would be illegal, void and of no effect.

The ineligibility of the "justices and judges" attaches to them as individuals, and not merely in office, and extends not only while they hold office, but during the term for which they are elected.

Nor is the principle changed when the office emanates from another authority. The constitutional inhibition remains the same. It is still the law which governs the courts of this State—an unchanging and unbending rule from which there is no escape.

It is true that as a government the State of Kansas has no control over the eligibility or qualifications of officers of the United States. If one of the judges of the State accepts an office under the United States and that government permits him to perform its duties and receive its emoluments, it is a matter over which the tribunals of the State have no control; but when the legal question is properly presented, it becomes their duty to declare the law, and that law is not changed by the want of power to follow its violation into another jurisdiction. It still remains the fundamental law of this State, governing its courts and furnishing the rule for its guidance.

While we cannot interfere with the tenure of office which the United States may prescribe for its officers, it is clearly within our province to declare what effect the acceptance of such an office will have on the tenure of an officer of this State, and when that is declared by the constitution, courts

have no other duty than to apply in cases properly before them.

Violation of law by an officer or misconduct in office do not of themselves work a vacation of office though they may be causes for removal.

Taking fees is prohibited to judges; yet the taking of a fee by a judge would not vacate his office, though it would be a good ground for his removal.

We think, therefore, that it is manifest that this constitutional provision does not provide for a vacancy or in any way prescribe a rule for the ascertainment of one. Now, is there any other clause in the constitution bearing upon the question as it is presented? And as it is only in that instrument that the tenure of the judicial office can be found, we reach the conclusion that the mere acceptance of an office under the United States does not of itself vacate the office of judge.

If, however, our reasoning on this point should fail in convincing any mind, an inquiry into the question of fact disclosed in the record, will lead to the same conclusion so far as the final disposition of this case is concerned. That is that under any view of the law, Judge Ewing had accepted no office under the United States previous to the 26th day of October, 1862.

His resignation on that day shows that up to that time he considered himself as holding the office of chief justice, and as not having previously by any act of his resigned the office either by doing so expressly or by implication.

Did he in law hold an office under the United States?

An office in this country can only be created by law.

A deputy recruiting commissioner under James H. Lane is not an officer known to or recognized by either State or national laws.

The appointment by Mr. Lane, "recruiting commissioner," of a colonel in the volunteer service of the United States, is without the shadow of warrant of law.

The regiment was not raised under the militia laws of this State, and the pretended election of Judge Ewing by the company officers, was a proceeding not known to the law, and a mere nullity.

The effect of mustering Judge Ewing into the service of the United States, could not be to make him an officer of the United States. If so, it would be in the power of a mustering officer to create officers without the intervention of the President, or any other legally constituted appointing power.

It is apparent therefore, that none of the alleged facts from which it is claimed that Judge Ewing held the office of colonel, had any legal effect whatever.

An officer is defined as " one who is lawfully invested with an office."

Judge Ewing could not accept an office which was not tendered to him by some authority having the legal right to make such tender.

In contemplation of law he could not become an officer by his own acts or on his own motion. If he was an officer he was legally entitled to hold and enjoy the office. Yet after the appointment and mustering in of Judge Ewing, and after he had entered upon the discharge of his military duties, if the President or Governor had exercised the power conferred upon them by law and appointed another man to the office of colonel of the 11th regiment, the person so holding the commission, would have been clearly entitled to the office.

The letter of the Secretary of War of the date of 5th November, 1862, notifying Judge Ewing that he had been appointed colonel to rank as such from the 9th day of October, is conclusive evidence of the fact that the President by no act of his had appointed him colonel prior to the 5th November, and of the further fact that neither the President or Secretary of War intended to recognize him as colonel prior to the 9th day of October.

The State ex rel. The Attorney General v. Commissioners Leavenworth Co.

If he was an officer prior to that time his appointment at that time was a nullity.

We do not propose to inquire into the responsibilities and rights of a person exercising the duties of an office without sufficient authority. Such a discussion is foreign to the questions involved in this case and would be useless.

Sufficient is shown that up to a period less than thirty days prior to the general election in 1862, Judge Ewing did not rightfully and by virtue of any competent authority hold an office under the United States.

Wherefore judgment is given for the defendant in this case, and against the informant John H. Watson for costs.