No. 31,206.

W. T. MARKHAM, *Plaintiff*, v. E. A. CORNELL, *Defendant*.

(18 P. 2d 158.)

Opinion filed January 28, 1933.

*T. M. Lillard, Clayton E. Kline* and *O. B. Eidson,* all of Topeka, for the plaintiff.

*Robert Stone, James A. McClure, Robert L. Webb, Beryl R. Johnson* and *Ralph W. Oman,* all of Topeka, for the defendant.

The opinion of the court was delivered by

SMITH, J.: This is an original action in mandamus to compel the secretary of state to countersign a commission appointing plaintiff superintendent of public instruction. The case was submitted on the pleadings and a stipulation as to the facts.

The facts are as follows: George A. Allen was elected superintendent of public instruction at the election in 1930 for a two-year term. He qualified and served that term till he was killed in an automobile accident on December 7, 1932. At the election in November, 1932, he had been reëlected for the two-year term beginning January 9, 1933. The certificate of election had been delivered to him the day before his death. His death left about a month to serve on the term to which he had been elected in 1930. On account of his death there is no one with a certificate of election for the term beginning January 9, 1933.

On the day that Mr. Allen was killed and for several days thereafter Governor Woodring was out of the state on other than official business. He was governor at the time of the death of Mr. Allen, but had been defeated at the election in 1932. His term expired January 9, 1933. J. W. Graybill was the lieutenant governor at the time of the death of Mr. Allen. His term expired January 9, 1933.

The manner of making appointments by the governor to fill vacancies is as follows:

First, the governor makes up his mind whom he wishes to appoint. He then signs a requisition requesting the secretary of state to issue a commission to the person named. It has been the custom of the governor, when expecting to be absent for a few days, to sign a few of these requisitions in blank and to leave instructions with his private secretary to sign his name when necessary. The next step is that the secretary of state fill in and countersign a commission. This commission is then returned to the governor, who signs it and causes the great seal of the state to be affixed to it. The appointment is then complete.

On December 7, 1932, Mr. Allen was killed. On December 9 Governor Woodring, then in New York, called his secretary by telephone

and directed him to send a requisition to the secretary of state requesting a commission for the appointment of W. T. Markham as superintendent of public instruction. No commission was issued upon this requisition.

On the day of the death of Mr. Allen, Mr. Graybill was in Arkansas. On December 10 he returned to Kansas and to Topeka. At Topeka he called on Mr. Stacey, who had been assistant to Mr. Allen during all the years that he had been superintendent. He offered Mr. Stacey the appointment to succeed Mr. Allen. Mr. Stacey signified his willingness to accept the appointment, whereupon Mr. Graybill stated that he, as lieutenant governor and president of the senate of the state of Kansas and in the absence of the governor from the state, did appoint W. A. Stacey as superintendent of public instruction to fill the vacancy caused by the death of George A. Allen. He then attempted to deliver the written appointment and commission to the secretary of state. That office was closed, however, and these documents were sent to the home of the secretary of state.

On December 12 Governor Woodring returned to Kansas. On that day he signed personally and issued to W. T. Markham, plaintiff herein, a commission appointing him state superintendent of public instruction. He affixed the seal to this commission and presented it to the secretary of state. He requested that official to countersign this commission. This the secretary of state refused to do. This action was brought by the plaintiff to compel the secretary of state to countersign that commission.

The theory of the secretary of state, the lieutenant governor and Mr. Stacey is that the governor had no authority to perform any official act while he was outside the state; that on that account his action of December 9 in directing his secretary to requisition a commission for Mr. Markham was of no effect whatever. From this proposition they reach the conclusion that since the governor was out of the state and could not act, the lieutenant governor became executive head of the state government and could name Mr. Stacey.

The case presents two questions: What was the effect of the action of the governor when he was in New York? Did the absence of the governor give the lieutenant governor power to act as governor? The answer to the first question lies in a number of decisions of this court where it has been held that the powers of any officer are limited to the territory of which he is an officer. In

*Morrell v. Ingle,* 23 Kan. 32, we held that a sheriff could not act outside his own county. In *Comm'rs of Marion Co. v. Barker,* 25 Kan. 258, the court followed the same rule with reference to county commissioners who met outside of the state and made a levy. To the same effect is *Phillips v. Thralls,* 26 Kan. 780, as to proceedings of a justice of the peace outside his township. (See, also, *A. T. & S. F. Rld. Co. v. Rice,* 36 Kan. 593; *State v. Durein,* 65 Kan. 700.) The same rule has been followed in other jurisdictions. (See *Eichoff et al. v. Caldwell,* 51 Okla. 217; also, *Harris v. State,* 72 Miss. 960.) We conclude, then, that as far as conferring any right or title to the office of superintendent of public instruction the act of the governor in telephoning his private secretary to send the requisition to the secretary of state for a commission for Mr. Markham was without effect. It may be said here, however, that the mere act of making the requisition on the secretary of state by itself would have conferred no right or title on Mr. Markham, even if the governor had been in his office at the time. The appointment was not complete till it had been signed by the governor, countersigned by the secretary of state and had the great seal of the state affixed.

Having agreed with defendant so far, we must now consider the next step in his theory. He argues then: The governor was powerless to act; the state must never be without an executive head; therefore, in the absence of the governor the lieutenant governor could act. If this reasoning is sound, the appointment of Stacey by Mr. Graybill was good, and there was no vacancy for Governor Woodring to fill when he returned from New York. This question must be determined under the constitution. The pertinent section is as follows:

"In case of the death, impeachment, resignation, removal or other disability of the governor, the power and duties of the office for the residue of the term, or until the disability shall be removed, shall devolve upon the president of the senate." (Art. 1, § 11.)

It will be seen that the argument is in effect that the absence of Governor Woodring from the state constituted "other disability of the governor."

It is well known by the student of constitutional history that the constitutions of certain states were used as models for the constitution of Kansas. In fact, the convention voted on the question of which constitution should be used. On the final vote Ohio

received twenty-five votes, Indiana twenty-three and Kentucky one. Other constitutions that were used were those from Iowa of 1857, Wisconsin of 1848, Illinois of 1848, Minnesota of 1857, New York of 1846, Pennsylvania of 1838, and the earlier Kansas constitutions of Topeka, Lecompton and Leavenworth. (See The Sources of The Constitution of Kansas, by Rosa M. Perdue, Wyandotte Constitutional Convention, 676.) The committee on the article which dealt with the executive branch used the corresponding article in the Ohio constitution almost entirely.

Constitution writing was not a new art in 1859 when ours was written. It had been going on in the United States for seventy-five years. Three constitutions had been written for Kansas. The men who sat in the Wyandotte convention naturally looked to the constitutions of the states whose native sons they were. We are not compelled to guess what they meant by the language they used.

Some of these constitutions provided that absence from the state on the part of the governor should be a ground for the lieutenant governor assuming the powers of governor. Some did not.

The constitution of Indiana in effect at the time our constitution was adopted was that of 1816. Section 17 of article IV of that constitution was as follows:

"In case of impeachment of the governor, his removal from office, death, refusal to qualify, resignation, *or absence from the state,* the lieutenant governor shall exercise all the powers and authority appertaining to the office of governor, until another be duly qualified, or the governor absent or impeached, shall return or be acquitted." (See R. S. Indiana for 1838.)

The constitution of Kentucky, which was in effect at the time of the adoption of our constitution, was that of 1850. Section 17 of article III of that constitution was as follows:

"Should the governor be impeached, removed from office, die, refuse to qualify, resign, *or be absent from the state,* the lieutenant governor shall exercise all the power and authority appertaining to the office of governor, until another be duly elected and qualified, or the governor absent or impeached shall return or be acquitted." (See R. S. of Kentucky for 1852.)

The constitution of Michigan of 1850 was also used as a guide. Section 12 of article V of that constitution is as follows:

"In case of the impeachment of the governor, his removal from office, death, inability, resignation, *or absence from the state,* the powers and duties of the office shall devolve upon the lieutenant governor for the residue of the term, or until the disability ceases. When the governor shall be out of the state in time of war, at the head of a military force thereof, he shall continue com-

mander in chief of all the military force of the state." (See Compiled Laws of Michigan, 1857, vol. 1.)

Section 16, article IV of the constitution of Missouri for 1820 is as follows:

"When the office of governor shall become vacant, by death, resignation, *absence from the state,* removal from office, refusal to qualify, impeachment, or otherwise, the lieutenant governor . . . shall possess all the powers and discharge all the duties of governor." (See Missouri R. S., 1825.)

It has been said that the constitution of New York was a model for many of the constitutions of other states. Section 6 of article III of the constitution of that state for 1821 provides as follows:

"In case of the impeachment of the governor, or his removal from office, death, resignation, *or absence from the state,* the powers and duties of the office shall devolve upon the lieutenant governor for the residue of the term, or until the governor absent or impeached shall return or be acquitted. But when the governor shall, with the consent of the legislature, be out of the state, in time of war, at the head of a military force thereof, he shall still continue commander in chief of all the military force of the state." (See Revised Statutes of New York, Banks & Brothers, 5th ed., vol. 1, 1858.)

The constitution of Wisconsin for 1848, section 7, article V, provides as follows:

"In case of the impeachment of the governor, or his removal from office, death, inability from mental or physical disease, resignation, *or absence from the state,* the powers and duties of the office shall devolve upon the lieutenant governor, for the residue of the term, or until the governor, absent or impeached, shall have returned, or the disability shall cease. But when the governor shall, with the consent of the legislature, be out of the state in time of war, at the head of the military force thereof, he shall continue commander in chief of the military force of the state." (See R. S. of Wisconsin, 1849.)

The constitution of Illinois, section 18, article III, provides as follows:

"In case of an impeachment of the governor, his removal from office, death, refusal to qualify, resignation, *or absence from the state,* the lieutenant governor shall exercise all the power and authority appertaining to the office of governor, until the time pointed out by this constitution for the election of governor shall arrive, unless the general assembly shall provide by law for the election of a governor to fill such vacancy." (See R. S. of Illinois, 1845.)

Section 17 of article IV of the constitution of-Iowa for 1857 provides as follows:

"In case of the death, impeachment, resignation, removal from office, or other disability of the governor, the powers and duties of the office for the residue of the term, or until he shall be acquitted, or the disability removed,

shall devolve upon the lieutenant governor." (See Laws of Iowa, Revision of 1860.)

Section 14 of article II of the constitution of Pennsylvania of 1838 provides, in part, as follows:

"In case of the death or resignation of the governor, or his removal from office, the speaker of the senate shall exercise the office of governor . . . ." (See Brightly's Purdon's Digest, 1700-1872.)

Section 6 of article V of the constitution of Minnesota for 1857 provides, in part, as follows:

"The lieutenant governor shall be *ex officio* president of the senate; and in case a vacancy should occur, from any cause whatever in the office of governor, he shall be governor during such vacancy. . . ." (See Statutes of Minnesota, 1849-1858.)

Section 18 of article IV of the Lecompton constitution was as follows:

"In case of the removal of the governor from office, or his death, failure to qualify, resignation, *removal from the state,* or inability to discharge the powers and duties of the office, the said office, with its compensation, shall devolve upon the lieutenant governor. . . ."

It has been remarked heretofore that the constitution of Ohio was used as a model. Section 15 of article III of the constitution of that state is as follows:

"In case of the death, impeachment, resignation, removal, or other disability of the governor, the powers and duties of the office, for the residue of the term or until he shall be acquitted, or the disability removed, shall devolve upon the lieutenant governor." (See Swan's Revised Statutes of Ohio for 1854.)

With due deference to the many distinguished men who have held the office of lieutenant governor, it is interesting to note the colloquy which occurred in the Wyandotte convention when the committee which had prepared the article on the executive branch of the government reported on section 1 of that article. The proposed section follows:

"Section 1. The executive department of the state shall consist of a governor, secretary of state, auditor, treasurer and attorney-general, who shall be chosen by the electors of the state at the time and place of voting for members of the general assembly, and shall hold their offices for the term of two years from the 2d Monday of January next after their election, and until their successors are elected and qualified."

When the adoption of the section was moved the following colloquy occurred:

"MR. STINSON. Mr. Chairman, I move to amend by inserting after the word 'governor' the words 'lieutenant governor.'"

"MR. McDOWELL. Mr. Chairman, before that motion is put I want simply to say a word. This matter was considered in committee, and we thought it advisable to have no lieutenant governor in the new state of Kansas. We thought it was a useless office and therefore incurred a useless expense—a sort of a figure on the chequer board that don't amount to much. Since broaching the matter, however, we have discovered there are so many gentlemen here wishing to fill that office, that we think it might be changed."

"MR. STINSON. I would state that Mr. McDowell's opposition to creating the office has only been withdrawn since one of his friends suggested that he might receive the nomination."

By that narrow a margin the state escaped the necessity of getting along without a lieutenant governor. (See Convention Proceedings, Wyandotte Constitutional Convention, pp. 346-348.)

It will be noted that of all the constitutions that were used as models, the constitutions of Ohio, Iowa, Minnesota and Pennsylvania were the only ones that did not provide specifically that absence from the state on the part of the governor created a vacancy in the office. We have examined the matter of the similar provisions in the constitutions of other states because of the rule that we can best fathom what men intended by the language they used when we have placed ourselves as nearly as possible in their shoes. We must see things with their eyes as nearly as possible. The constitutions that we have examined contained the words "absence from the state" and also "or other disability." Had these framers of our constitution intended that absence from the state should be construed as "other disability" they surely would have put the words "absence from the state" in the constitution, since it was in most of the constitutions they were using as models.

We are aware of the fact that constitutions and their interpretation should march abreast of the times. Words must yield to the pressure of changed social conditions, more enlightened ideals, advanced business organizations and the general march of progress. Let us examine the question under consideration, keeping this rule in mind.

When the convention was writing the Wyandotte constitution travel was by boat or by horse-drawn vehicle, communication was by telegraph or by mail. The trip from Washington to Topeka was a journey not to be lightly undertaken. A decision reached by an official absent in a neighboring state or a more distant one would

be slow in being transmitted to Topeka, and at best would be of uncertain accuracy. It would not have been surprising if they had considered the matter and decided that the governor should stay at home or give up his office. At the time our constitution was written wild Indians threatened the western frontiers of our state, border ruffians threatened the eastern frontier. The people of the state were to see it invaded by armed bands and some of its cities left in ashes. Surely there was great reason why these men should be cautious and on guard to insure that the executive power would never lapse. Knowing all these things, they did not see fit to provide in the constitution that the absence of the governor from the state would confer the executive power on the lieutenant governor. How different is the situation now? The utmost limits of the country are only a matter of about two or three days' journey by rail. It is hardly possible to get out of communication by wire. The governor talked from New York to his secretary as easily as he could have reached him had his trip taken him to Neodesha, Kan., for a week-end visit. Ordinarily the aeroplane in which the governor sought to return to Topeka from New York would have brought him to Topeka almost as soon as a train would have brought him from the western borders of the state. It may be safely said that there is not nearly as much reason to-day for providing that absence from the state should constitute a vacancy as there was when the constitution was written.

An interpretation of a constitution must be studied as carefully as the writing of one. We must study the language used by the framers of that document with the thought in mind that what the constitution is consists not of what the writers of it said, but what the courts say they meant by what they said. On this account a constitutional decision has results far beyond the issues framed by the pleadings in the case at bar. This court cannot shut its eyes to these results.

We have already seen the first section of the executive article of our constitution. This section provides for a governor, lieutenant governor, secretary of state, auditor, treasurer, superintendent of public instruction and attorney-general. These officers hold their offices by the will of the people. Each one has duties, responsibilities, rights and functions peculiar to his office. The constitution

provides that each must report to the legislature each biennium. Their responsibility is to the people.

Bearing this fact in mind, we will examine the provisions with reference to filling vacancies in the offices other than governor. Section 14 of article I of the constitution is as follows:

"Should either the secretary of state, auditor, treasurer, attorney-general, or superintendent of public instruction, become incapable of performing the duties of his office for any of the causes specified in the thirteenth section of this article, the governor shall fill the vacancy until the disability is removed, or a successor is elected and qualified. Every such vacancy shall be filled by election, at the first general election that occurs more than thirty days after it shall have happened; and the person chosen shall hold the office for the unexpired term."

The thirteenth section referred to in the above section is as follows:

"If the lieutenant governor, while holding the office of governor, shall be impeached or displaced, or shall resign or die, or otherwise become incapable of performing the duties of the office, the president of the senate shall act as governor until the vacancy is filled."

Should we hold that absence from the state constitutes "or other disability" on the part of the governor under section 11, it would be taken as a precedent for holding that absence from the state on the part of the secretary of state, auditor, treasurer, attorney-general, or superintendent, constitutes "become incapable of performing the duties of the office" under section 13. In that case every time one of these officers left the state the governor might fill his place. Each one of these officers has duties that occasionally take him out of the state. The state charter board is comprised of the attorney-general, the secretary of state, and the bank commissioner. The bank commissioner is an appointee of the governor. Suppose there should be a matter pending before the charter board in which the governor was interested. Suppose he and the attorney-general differed on this matter. The governor might be right. The attorney-general might be wrong. Strong men differ widely in their ideas, each in good faith, each actuated by a high desire to be of service to the people. We all know that this has happened in the past in our state and will happen again. The people, however, placed the attorney-general in the position where it was his responsibility to decide. Should it be held that absence from the state vacates the office, the governor might find the attorney-general out

of the state some time, appoint an attorney-general who would do his bidding and control the actions of the charter board. Is the possibility of such situations to be desired? Would it dignify the high offices which our constitution creates?

With all these constitutions before them it is only fair to assume that the framers of the Wyandotte constitution considered the likelihood of something of that kind happening and guarded against it by refusing to include "absence" from the state among the grounds that would vacate the office of governor.

We have noted that there are some states whose constitutions provide that the powers and duties of the governor shall fall on the lieutenant governor if the governor is "absent" from the state. Under those provisions it has been held that a mere temporary absence of the governor from the state for a few days does not bring the lieutenant governor into office. We are constrained to adopt the reasoning of those cases.

In *State, ex rel., v. Lahiff,* 146 Wis. 490, the court considered a city charter which provided that during the absence of the mayor from the city the president of the council could exercise all the powers of the mayor. The mayor was absent from the city for a few days. During his absence the president of the council undertook to make some appointments which it was the duty of the mayor to make. The court upheld the mayor and said:

"'Absence' must be construed reasonably, and so construed means, we think, what may be called 'effective' absence. If during the mayor's absence from the city, even for a brief time, a riot occurs, or an occasion arises which demands immediate exercise of the executive power to preserve order or enforce the laws, the powers and duties of the mayor to meet the emergency must necessarily be vested in the president of the council fully and completely during the period of the absence." (p. 492.)

In *Watkins v. Mooney,* 114 Ky. 646, the court considered the same sort of a provision in a city charter and reached a like result.

In *Tennant's Case,* 3 Neb. 409, the court considered a section of the constitution which read as follows:

"In case of the impeachment of the governor, his removal from office, death, resignation, or absence from the state, the powers and duties of the office shall devolve upon the secretary of state, until such disability shall cease, or the vacancy be filled." (p. 413.)

During the absence of the governor from the state for a few days the lieutenant governor issued a proclamation calling a special ses-

sion of the legislature.  The governor returned before the legislature met, and revoked the call.  The court said:

"I can say, however, when the question was first presented to me I was strongly inclined to the opinion insisted upon for the respondent, that as soon as the governor sets his foot beyond the limits of our state, the officer next in succession therein may at once assume all the authority, and exercise all or any of the duties pertaining to the executive department of government. But when I reflect upon the possible consequence of such a construction of the constitution, upon the disgraceful tricks, strifes and exhibitions, which might be entailed upon the people of the state, of which our present attitude presents a sad and humiliating commentary, I am induced to hesitate and cast about me for a more salutary rule, one which, while it will insure the efficient administration of the affairs of state during a brief temporary absence of the executive, will at the same time protect this department of the government against unnecessary and ill-advised intrusion."  (p. 421.)

In *State, ex rel. Warmonth, v. Graham,* 26 La. Ann. 568, the court considered a section of the constitution of Louisiana which provided that "during the absence from the state" of the governor the powers and duties of his office should devolve upon the lieutenant governor.  The court said:

"The question to be decided is, does the absence of the governor from the state for a few hours or a few days create a vacancy in this office and authorize the assumption of the duties, prerogatives and emoluments thereof, by the lieutenant governor during said absence."  (p. 569.)

The court further said:

"It is evident, if the lieutenant governor be authorized to exercise the functions of the governor during any temporary absence of the governor from the state, he may also whenever the governor is unable to attend to the duties of his office on account of sickness—in case 'of inability to discharge the powers and duties of his office.'  We do not believe this to be the meaning intended by the framers of the constitution.  The inability to discharge the duties of the office as well as the absence from the state, spoken of in the article, are such as would affect injuriously the public interest.  The mere absence, at Pass Christian, within a few hours' run of the capital, could not, by any possibility, affect the public interest."  (p. 569.)

A search of the books indicates there is not a case where the courts have held that under a constitutional provision such as ours, the lieutenant governor could assume the duties and powers of the governor when the governor was temporarily absent from the state.

We are familiar with the opinion in the case of *Ex parte Crump,* 10 Okla. Cr. 133, where it was held that temporary absence from the state on the part of the governor conferred the rights and duties

of the governor on the lieutenant governor. In that case, however, the constitution contained a provision that "removal from the state" of the governor was one of the events under which the lieutenant governor succeeded to the powers and duties of governor. We have also read the opinion of *Montgomery et al. v. Cleveland,* 134 Miss. 132, where the same sort of a holding was made. In that case, also, the section of the constitution considered contained the provision "absent from the state." An examination of all these authorities has convinced us that even in cases where the constitution provides that the powers and duties of the governor devolve upon the lieutenant governor when the governor is absent from the state, the better reasoning and careful consideration for the welfare of society and the stability of government make the conclusion inevitable that the temporary absence of the governor for a few days, when no public emergency exists that threatens existence of orderly government, is not sufficient to confer the powers and duties of governor on the lieutenant governor.

The absence must be an effective absence, that is, it must be such absence as takes it entirely out of the range of possibility for the governor to exercise any control over affairs of the state. There must be a situation where the peace and dignity of the state is in danger, or the orderly functioning of government is threatened. When the business of enforcing the laws is considered we need only remember that the enforcement of the law is a duty with which the attorney-general is charged. When we speak of preserving the peace, it may be said that the local officers are charged with this duty. We are aware that occasionally the governor has called out the national guard in order to preserve the peace. This is always done at the request of the local authorities and after they have found themselves unable to cope with the situation.

It need not be said here that should a mob be menacing the lives and property of the citizens of one of our cities and the local authorities should be unable to cope with it and the governor be out of the state, the government would sit idly by and watch the mob work its fury. In a time of grave emergency for the welfare, or indeed the very existence of the state, the lieutenant governor would have authority to call out the national guard to quell the disturbance.

That characteristic of American constitutions and of the people who have been trained under them is the thing that has made possible

the great development of our form of government and has given it
the ability to meet and survive the crises that have arisen from
time to time. We are not called on to decide such a case here. There
was no emergency threatening the state. Neither enforcement of the
law nor maintenance of the peace was at stake. No more time had
elapsed after the death of Mr. Allen, before the things spoken of
occurred, than ordinarily passes before the appointment of a suc-
cessor to an official who has died. It cannot be said that there was
such an emergency as called for the assuming of the powers and
duties of the governor by the lieutenant governor.

In such a case, moreover, the taking over of the powers of the
governor by the lieutenant governor should be marked by some
public manifestation of the intentions of that official so to do. It
is important that the executive power of the state should not lapse.
It is of equal importance that the people should know who is exercis-
ing the power and authority of governor. As has been heretofore
remarked in this opinion, the executive department of our state
government is comprised of a number of officials. These officials
have duties and responsibilities which are interrelated. Every day
their official lives touch. How can the machinery of the state gov-
ernment function in an orderly manner if none of these officials
would know when he came to the office in the morning whether the
governor or lieutenant governor was exercising the powers and au-
thority of the governor?

There is some precedent in Kansas for this view. In 1868 Gov-
ernor Crawford decided to take command of the 19th regiment of
Kansas cavalry which was about to leave Topeka for a six-months'
campaign against the Indians. He resigned as governor and Lieu-
tenant Governor Green took the oath as governor. (See The Leaven-
worth Times and Conservative, Nov. 5, 1868. Archives, The State
Historical Society.) This happened about ten years after the con-
stitution was written. We must consider historical events when
dealing with constitutional questions. We must assume that Gov-
ernor Crawford and Lieutenant Governor Green conferred about
this situation. No doubt they took counsel with the lawyers of the
state, many of whom had sat in the Wyandotte convention.

In considering the meaning to be given section 11 of article 1 of
the constitution, we must give some weight to this occurrence, which
was the first time action was taken which required an interpretation

of this section. Evidently these officials thought it was necessary for the governor to resign before the lieutenant governor could assume the duties and powers of the office of governor, and that Lieutenant Governor Green must take the oath of office before he would be entitled to act as governor.

What has been said leads us to the conclusion that the absence of Governor Woodring from the state did not constitute "other disability" of the governor so as to confer the rights and duties of the governor on the lieutenant governor. This being true, the action of Lieutenant Governor Graybill in attempting to appoint Mr. Stacey was a nullity. From this it follows that when Governor Woodring returned from New York on December 12 there was a vacancy in the office of superintendent of public instruction. It was his duty to fill this vacancy by appointment. He discharged his duty by the appointment of Mr. Markham. The method of making an appointment has been described heretofore. The countersigning of the commission is a ministerial act on the part of the secretary of state. It was his duty to countersign the commission of Mr. Markham when it was presented to him by the governor.

There is another question in this case. The pleadings are framed so as to present the question of the tenure of office of Mr. Markham in case it should be held that he was rightfully appointed.

This appointment was made under section 14 of article 1 of the constitution. That section is as follows:

"Should either the secretary of state, auditor, treasurer, attorney-general, or superintendent of public instruction, become incapable of performing the duties of his office for any of the causes specified in the thirteenth section of this article, the governor shall fill the vacancy until the disability is removed, or a successor is elected and qualified. Every such vacancy shall be filled by election, at the first general election that occurs more than thirty days after it shall have happened; and the person chosen shall hold the office for the unexpired term."

It will be seen that the section provides that the governor shall fill the vacancy until the disability is removed or a successor is "elected and qualified." The death of Mr. Allen has rendered him incapable of performing the duties. The disability cannot be removed. The vacancy must be filled "until a successor is elected and qualified." It is argued that the court should read into the section the words "or appointed" so as to permit a construction that the section really means that the vacancy should be filled until the dis-

ability is removed or a successor is elected or appointed and qualified. The trouble with that argument, however, is that the section further provides that "Every such vacancy shall be filled by election at the first general election that occurs more than thirty days after it shall have happened; and the person chosen shall hold the office for the unexpired term." Here again it is plain that the framers of the constitution had in mind that there should be only one vacancy. This vacancy was to be filled by the governor, and only a person possessed of a certificate of election to the office was to be entitled to take the office from the governor's appointee.

This conclusion is doubly fortified by the provision in the section with reference to "thirty days." Had the vacancy occurred any time within thirty days of the general election for 1932 the appointee would be in the same position as where he was appointed, as in the case at bar, to fill a vacancy occurring between the time of the general election and the starting of the new term. In this connection it is asked, How can a governor make an appointment for a term beyond the limit of the term the governor is himself serving? The answer is that the governor fills the vacancy and the appointee is entitled to the office against any one except some person with a certificate of election to the office at a general election. This cannot happen till the general election of 1934. The question is, Was there a vacancy in the office of superintendent of public instruction on January 9, 1933, when the new term started? The answer is "no," because the vacancy caused by the death of Mr. Allen had been filled "until the next general election," and the only provision for filling that vacancy other than by appointment of the governor is by the people at a general election. This has not occurred.

In *McIntyre v. Iliff,* 64 Kan. 747, 68 Pac. 633, the court considered a similar provision with reference to judicial offices. The syllabus is as follows:

"The phrase 'until the next regular election,' as used in section 11 of article 3 of the constitution, providing for appointments to fill vacancies in judicial offices, means until the next regular election held at the time fixed by law for the filling of the particular class of judicial offices to which the appointment was made."

This ruling followed the cases of *State, ex rel. Watson, v. Cobb,* 2 Kan. 32, and *Matthew v. Comm'rs of Shawnee Co.,* 34 Kan. 606, 9 Pac. 765. The rule is founded on sound reasoning and will not be disturbed.

In *State, ex rel., v. Irey,* 116 Kan. 21, 225 Pac. 1050, this court held that where the person who had been elected to an office was unable to qualify, the incumbent in possession was entitled to hold over until a proper successor could be legally chosen or elected. The court said:

"The rule awarding possession to the holder of the certificate of election does not apply here, because this proceeding is quo warranto—one in which the title to the office is the very matter to be determined, and in this instance has been determined. The state constitution provides that 'All judicial officers shall hold their offices until their successors shall have qualified.' (Art. 4, sec. 12.) The verb 'qualify' in this connection ordinarily has reference to taking of an oath and giving a bond, but it presupposes a valid selection of the person performing these acts and his competence to hold the office. No other claimant would be a 'successor' within the meaning of the provision quoted. If no election had been held in 1922 and a right to the office should be asserted by some one appointed by the board of county commissioners, or any one else having no authority in that connection, and he were to take the oath and give the bond, the defendant's right to continue holding the office would obviously not be affected. 'It seems to be well settled that the indefinite portion of time indicated by the phrase "until their successors shall be qualified" is as much a part of the term of office as the time during which the officer is entitled absolutely to hold. In the one case he is entitled to hold as against everyone, and in the other as against everyone except such as should come with legitimate credentials.' (*Pruitt v. Squires,* 64 Kan. 855, 858; 68 Pac. 643.) 'The person holding any civil office under the state is entitled by the constitution to continue to exercise the duties of the office until his successor is duly qualified. There can be no doubt but that the "successor" is one legally chosen or elected.' (*Ballantyne v. Bower,* 17 Wyo. 356, 366.) The tenure of the incumbent lasts until some one else has acquired a legal right to hold the office." (p. 24.)

The reasoning in that case is clear and sound and lays down a rule which we have no disposition to disturb.

On the question of whether there was a vacancy in the office of superintendent of public instruction on January 9 when the new term started the authorities are nearly in agreement. The general rule is stated in Mechem on Public Offices, section 397, as follows:

"It is usually provided by law that officers elected or appointed for a fixed term shall hold not only for that term but until their successors are elected and qualified. Where this provision is found, the office does not become vacant upon the expiration of the term if there is then no successor elected and qualified to assume it, but the present incumbent will hold until his successor is elected and qualified, even though it be beyond the term fixed by law."

In the case of *The People v. Lord,* 9 Mich. 227, the court consid-

ered a constitutional provision similar to ours. The syllabus of that case is as follows:

"A judge of probate was reëlected, but before the commencement of his new term died, and an appointment was made by the governor to fill the vacancy, January 1 (when the new term would commence). The governor, on the supposition that there was now a new vacancy, made another appointment. It was held that the second appointment was void, and that under the constitution the person first appointed would hold until a successor was elected and qualified."

In *State v. Metcalfe*, 80 Ohio St. 244, the question was passed on by the court. The constitutional provision was the same. The court said:

"The capacity conferred upon an elective officer by said article to serve until a successor is elected and qualified attaches to and may be enjoyed by one appointed to succeed, where the elected officer has resigned. And where, after the election of a judge of the circuit court, the person so elected, prior to the time when the term is to commence, and without qualifying as judge, dies, and the judge then holding the office resigns before the expiration of his original term, and another is appointed, the appointee succeeds to the entire term, including the capacity to hold over enjoyed by his predecessor, and is, by force of the constitution, clothed with the power to hold the office until a successor is elected and qualified." (Syl. ¶ 4.)

This rule was announced in *State, ex rel., v. Speidel*, 62 Ohio St. 156. See, also, *Townsley v. Hartsfield*, 113 Ark. 253; *State v. Carvey*, 175 Ia. 344; *State of Utah v. Elliott*, 13 Utah, 471; *State, ex inf., v. Dabbs*, 182 Mo. 139. In *State, ex rel., v. Carvey*, 175 Ia. 344, in dealing with this question and speaking of one appointed to fill a vacancy caused by death, the court said:

"The vacancy created by his death was a vacancy of the office for the remainder of his current term. While there is considerable confusion in the cases, the great weight of authority is that where a reëlected incumbent dies before entering upon the new term, his death creates a vacancy in the term which he was then serving, but not in the term upon which he had not yet entered." (p. 351.)

The great weight of authority leads us to the conclusion that where an office is made vacant by the death of the incumbent between thirty days prior to the general election and the date for the commencement of the new term, the person appointed by the governor to fill the vacancy is entitled to hold the office till a successor appears with a certificate of election from a general election that occurred more than thirty days after the appointment.

The peremptory writ will be allowed, and it is held by the court that Mr. Markham is entitled to hold the office of superintendent of public instruction till his successor is elected at the general election in 1934 and duly qualifies.

THIELE, J., not participating.