IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 114,573

LARRY T. SOLOMON, CHIEF JUDGE,
30TH JUDICIAL DISTRICT OF THE STATE OF KANSAS,
*Appellee*,

v.

STATE OF KANSAS,
*Appellant.*

SYLLABUS BY THE COURT

1.

Whether a party has standing to pursue a declaratory judgment action is a question of law subject to unlimited review on appeal.

2.

In order to establish standing, a plaintiff must show that he or she suffered a cognizable injury and that there is a causal connection between the injury and the challenged conduct.

3.

In order to establish a cognizable injury, a party must show that he or she has a personal interest in the outcome of a case and personally suffers some actual or threatened injury as a result of the challenged conduct.

4.

A judge with conflicting official duties imposed by law has a justiciable interest in obtaining a judicial resolution of the conflict.

1

5.

The history and context of the 1972 amendment to Article 3, § 1 of the Kansas Constitution show that the Supreme Court's general administrative authority includes the power to make rules for process, practice, and procedure at all levels of the unified court system.

6.

The written Constitution of Kansas is paramount law because it emanates directly from the people.

7.

As a general rule, the legislature may enact statutes to facilitate or assist in the operation of a constitutional provision, but such legislation must be in harmony with and not in derogation of the constitution.

8.

The doctrine of independent governmental branches is firmly entrenched in United States and Kansas constitutional law.

9.

The powers entrusted to government are divided into three branches—the executive, the legislative, and the judicial—and the persons entrusted with power in any one of these branches may not encroach upon the powers conferred by the people upon the others.

10.

The doctrine of separation of powers is an inherent and integral element of the republican form of government and is expressly guaranteed to the states by the federal Constitution.

11.

The Kansas Supreme Court has the authority and duty to preserve the constitutional division of powers against disruptive intrusion by one branch of government into the sphere of a coordinate branch of government. In order for the interference by one department with the operations of another department to be unconstitutional, the intrusion must be significant.

12.

In reviewing whether one branch of government has significantly interfered with the operations of another branch to the point of violating the doctrine of separation of powers, courts consider four factors: (1) the essential nature of the power being exercised; (2) the degree of control by one branch over another; (3) the objective sought to be attained; and (4) the practical result of blending powers as shown by actual experience over a period of time.

13.

The Kansas Supreme Court's general administrative authority includes the power to promulgate and enforce reasonable rules regulating judicial administration and court procedure as necessary for the administration of justice.

Appeal from Shawnee District Court; LARRY D. HENDRICKS, judge. Opinion filed December 23, 2015. Affirmed.

*Stephen R. McAllister*, solicitor general, argued the cause, and *Jeffrey A. Chanay*, chief deputy attorney general, and *Dwight R. Carswell*, assistant solicitor general, were with him on the briefs for appellant.

*Pedro L. Irigonegaray,* of Irigonegaray & Associates, of Topeka, argued the cause, and *Elizabeth R. Herbert,* of the same office*,* was with him on the briefs for appellee.

*Steven C. Day*, of Woodard, Hernandez, Roth & Day, LLC, of Wichita, and *Amy S. Lemley*, of Foulston Siefkin LLP, of Wichita, were on the brief for *amicus curiae* Kansas State Committee of the American College of Trial Lawyers.

*Karen Michelle Donnelly* of Copilevitz & Canter, LLC, of Kansas City, Missouri, *Stephen Douglas Bonney*, of ACLU Foundation of Kansas, of Kansas City, Missouri, and *Micheline Z. Burger*, of Longmont, Colorado, were on the brief for *amicus curiae* American Civil Liberties Union Foundation of Kansas.

The opinion of the court was delivered by

ROSEN, J.: In 1861, the people of the new State of Kansas adopted a constitution that assigned judicial power to a supreme court and to various lower courts:

> "The judicial power of the State shall be vested in a supreme court, district courts, probate courts, justices of the peace, and such other courts, inferior to the supreme court, as may be provided by law; and all courts of record shall have a seal, to be used in the authentication of all process." Kan. Const. art. 3, § 1 (1861).

This multi-tiered system vested judicial power in both the Supreme Court and district courts, and the legislature provided rules for the administration of those courts.

4

For example, the General Statutes of Kansas, 1949, provided that seniority on the bench was the criterion for designating a "presiding judge" in larger judicial districts. G.S. 1949, 20-502, 20-602. The presiding judge had the authority to make "reasonable and uniform rules" for assigning actions and practice, for directing business, and for hearing motions, as long as those rules were not inconsistent with the code of civil procedure. G.S. 1949, 20-502.

In 1965, the Kansas Legislature passed the Judicial Department Reform Act, K.S.A. 1965 Supp. 20-318 *et seq*. The Kansas Supreme Court adopted rules implementing the Act. See *Report of the Judicial Advisory Committee*, 13 Washburn L.J. 271, 366 (May 1974). In 1966, the Kansas Supreme Court promulgated a new rule governing the assignment of cases in multiple-judge districts, effective July 1, 1967. In relevant part, it read:

> "In judicial districts comprised of one county which has seven or more judges . . . [all non-probate cases] shall be under the supervision and control of the Administrative Judge, who shall be designated by this Court. All cases shall be assigned by the Administrative Judge for trial to the other divisions of the District Court. The Administrative Judge may assign pretrial motions, pretrials and other preliminary matters to other divisions of the District Court." Rule 120(b), 197 Kan. lxxiv (1966).

In 1968, the Kansas Legislature codified Rule 120(b) by enacting K.S.A. 1968 Supp. 20-329, which read:

> "In every judicial district having more than one division, the supreme court may designate an administrative judge who shall have general control over the assignment of cases within said district court subject to supervision by the supreme court."

As we explained in *Behrmann v. Public Employees Relations Board*, 225 Kan. 435, 438-42, 591 P.2d 173 (1979), in 1968, the legislature established a citizen's committee to study and propose amendments to the constitution. L. 1968, ch. 265. In February 1969, that committee submitted its 124-page report to the legislature. Among the significant recommended changes in Article 3 was the creation of "a unified court with overall administrative and procedural rule-making powers in the supreme court branch thereof." Report of the Citizens' Committee on Constitutional Revision, p. 43 (February 1969); see *Behrmann*, 225 Kan. at 440.

The committee's commentary on the proposed changes revealed that the purposes behind amending Article 3, section 1, included the "[*p*]*roper supervision, administration and discipline of judicial personnel*" and "steadfast recognition of and insistence upon *vigilant maintenance of the doctrine of separation of powers*—with the three branches of government free from encroachments of each other." (Emphases added.) The report added that a proposed constitutional amendment unifying the court system

> "would create a unified court with overall administrative authority in the supreme court branch thereof and would vest the supreme court with rule making power regarding process, practice, and procedure *at all levels of the unified court*, as well as regarding appeals. *Such rule making power is, in reality, an inherent power of the judiciary*." (Emphases added.) Report of the Citizens' Committee, p. 43.

In 1972, the voters of the state of Kansas, in keeping with the recommendations of the Citizens' Committee, ratified an amendment to Article 3, § 1, of the constitution, which now reads:

> "The judicial power of this state shall be vested exclusively in one court of justice, which shall be divided into one supreme court, district courts, and such other courts as are provided by law, and all courts of record shall have a seal. *The supreme*

6

*court shall have general administrative authority over all courts in this state*."
(Emphasis added.)

In 1973, a Judicial Study Advisory Committee was formed pursuant to legislative authorization contained in Senate Joint Resolution No. 2 (1973 Session). Its purpose was to assist in a survey and study of the Kansas court system and to make recommendations to the judiciary and the legislature. See 13 Washburn L.J. at 273.

Among the ills that the Advisory Committee found in need of a cure was "fragmentation of judicial power," resulting in part in the "*unnecessary variations in the practices and procedures of individual local courts*." (Emphasis in the original.) 13 Washburn L.J. at 294. "Sound judicial administration requires *clear lines of responsibility and authority* as well as the resources adequate to ensure effective implementation of administrative policy." (Emphasis added.) 13 Washburn L.J. at 360. Accordingly, the Advisory Committee determined that "appointment procedures and trial court management" lay among the Supreme Court's policy-making responsibilities under the new, unified court structure. 13 Washburn L.J. at 362. This meant that the Chief Justice of the Supreme Court would exercise "general supervision over *all* matters" subject to the Supreme Court's policy-making power, including financial affairs of the courts and "the assignment of judges *at all levels*." (Emphasis added.) 13 Washburn L.J. at 364. In keeping with this mission, the Advisory Committee recommended that the Supreme Court "appoint a district judge to be the administrative judge of the unified district court in each judicial district." 13 Washburn L.J. at 366.

In 1976, the Supreme Court struck what had been Rule 120 and adopted a new Rule 107, which read in relevant part:

"In every judicial district the Supreme Court shall designate an administrative judge who shall have general control over the assignment of cases within said district under supervision of the Supreme Court. Assignment of cases shall be designed to distribute as equally as is reasonably possible the judicial work of the district. The administrative judge of each district shall be responsible for and have general supervisory authority over the clerical and administrative functions of the court." 220 Kan. lvii (1976).

This rule has since been modified and, effective July 1, 2012, Rule 107 now states in relevant part:

"(a) The Supreme Court will appoint a chief judge in each judicial district.

(1) Appointment. The Supreme Court will appoint a chief judge in each judicial district.

(2) Term. A chief judge is appointed for a 2-year term that begins January 1 in an even-numbered year. An interim appointment is for the remainder of the 2-year term.

(3) Reappointment. On or before November 30 in an odd-numbered year, an incumbent chief judge must notify the Supreme Court whether the judge wishes to be reappointed.

(4) Recommendation. A judge of the district court may recommend to the departmental justice the appointment of a chief judge for the judge's district. The Supreme Court must keep any recommendations confidential." (2015 Kan. Ct. R. Annot. 202.)

8

K.S.A. 20-329 also has been modified over time to harmonize it with Rule 107. In 1999, it was amended to read:

"In every judicial district, the supreme court shall designate a district judge as chief judge who shall have general control over the assignment of cases within the district, subject to supervision by the supreme court. Within guidelines established by statute, rule of the supreme court or the district court, the chief judge of each district court shall be responsible for and have general supervisory authority over the clerical and administrative functions of such court." L. 1999, ch. 57, sec. 17.

During the 2014 legislative session, the Kansas Legislature passed Senate Substitute for House Bill No. 2338. Section 11 of H.B. 2338 amended K.S.A. 20-329, which now reads:

"In every judicial district, the district court judges in such judicial district shall elect a district judge as chief judge who shall have general control over the assignment of cases within the district, subject to supervision by the supreme court. The procedure for such election shall be determined by the district court judges and adopted by district court rule. Within guidelines established by statute, rule of the supreme court or the district court, the chief judge of each district court shall be responsible for and have general supervisory authority over the clerical and administrative functions of such court. The district judge designated as chief judge by the supreme court on July 1, 2014, shall be allowed to serve as chief judge through January 1, 2016." K.S.A. 2014 Supp. 20-329.

Section 43 of H.B. 2338 is a nonseverability clause, which states:

"The provisions of this act are not severable. If any provision of this act is stayed or is held to be invalid or unconstitutional, it shall be presumed conclusively that the legislature would not have enacted the remainder of such act without such stayed, invalid or unconstitutional provision." L. 2014, ch. 82, sec. 43, effective July 1, 2014.

9

Larry T. Solomon is the chief judge of the 30th Judicial District of Kansas. He was initially appointed to serve as chief judge on July 1, 1991, and he has been reappointed continuously through the present. Under K.S.A. 2014 Supp. 20-329 (sec. 11 of H.B. 2338), his current term will end on January 1, 2016, and under Rule 107(a) his current term will end on December 31, 2015.

On February 18, 2015, Solomon filed in Shawnee County District Court a petition seeking a declaratory judgment under K.S.A. 60-1704. Solomon sought relief in the form of a judgment declaring sec. 11 of H.B. 2338 an unconstitutional encroachment on the constitutional authority of the Kansas Supreme Court to administer the judiciary of the state. Solomon also sought to have the entirety of H.B. 2338 declared invalid, arguing that if sec. 11 was declared unconstitutional, the nonseverability clause within sec. 43 prevented the remainder of the bill from being saved.

In response, the State of Kansas filed a motion to dismiss, asserting a lack of standing on Judge Solomon's part and contending that, as a matter of law, the legislative action was not unconstitutional. Judge Solomon countered with a motion for summary judgment, asking that the district court render a decision on the merits.

On September 2, 2015, the district court filed a memorandum decision and order that denied the State's motion to dismiss and granted Judge Solomon's motion for summary judgment. On September 3, 2015, the State filed an emergency motion to stay the order pending appeal, in which it asked the district court to stay that part of its order striking all of H.B. 2338 because of the nonseverability clause. On that same day, the district court granted the motion to stay.

The State filed a timely notice of appeal to this court based on K.S.A. 60-2101(b), which permits a final judgment in a civil action in which a state statute was held to be

10

unconstitutional to be appealed directly to this court. On appeal, the State asserts two grounds for reversing the judgment of the district court: lack of justiciability on Solomon's claim for relief and error by the district court in finding a violation of the separation of powers doctrine. We address these issues in turn.

JUSTICIABILITY

The State initially argues that this case does not present a justiciable case or controversy because Solomon has not suffered and may never suffer a cognizable injury as a result of sec. 11 taking effect. The State contends that Solomon therefore lacks standing to challenge the constitutionality of sec. 11 and that the matter is not yet ripe for adjudication.

We apply an unlimited standard of review to determine whether Solomon has standing to request a declaratory judgment regarding sec. 11's constitutionality and whether the issue is ripe for decision. See *Shipe v. Public Wholesale Water Supply Dist. No. 25*, 289 Kan. 160, 165-67, 170, 210 P.3d 105 (2009) (applying unlimited standard of review to determine whether district court lacked jurisdiction to render decision because plaintiffs lacked standing and issues they presented were not ripe for adjudication); see also *Gannon v. State*, 298 Kan. 1107, 1118-19, 319 P.3d 1196 (2014) (whether a claim is justiciable is question of law); *Robinson v. Kansas State High School Activities Ass'n*, 260 Kan. 136, 139, 917 P.2d 836 (1996) (applying unlimited standard of review to district court's decision regarding plaintiff's standing in declaratory judgment action).

Solomon brought his action under K.S.A. 60-1704 of the Declaratory Judgments Act, K.S.A. 60-1701 *et seq*. K.S.A. 60-1704 of that Act states:

> "Any person having an interest under a deed, will, written contract or other
> writings constituting a contract, or *whose rights, status or other legal relations are*

11

*affected by a statute*, municipal ordinance, contract or franchise, may seek determination of any question of construction or validity arising under that enactment, document or agreement and may obtain a declaration of rights, status or other legal relations thereunder." (Emphasis added.)

Also relevant to our analysis is K.S.A. 60-1701, which states that "[c]ourts of record within their respective jurisdictions shall have power to declare the rights, status, and other legal relations whether or not further relief is, or could be sought."

In order to show he had standing to bring a declaratory judgment action, Solomon alleged within his petition that

> "[a]s a member of the Kansas judiciary and the chief judge of his district, Judge Solomon has a direct interest in the integrity and viability of the Kansas unified court system as well as the Kansas Supreme Court's vital role in administering the various courts comprising that system, including the district court of the 30th Judicial District. As Chief Judge of one of the district courts directly impacted by H.B. 2338, *plaintiff's status, and other legal relations*, are directly affected by the legislation, and thus has standing to seek a declaration of H.B. 2338's invalidity pursuant to K.S.A. 60-1704." (Emphasis added.)

Later in his petition, Solomon noted that certain provisions within sec. 11 that call for district court judges in each judicial district to elect their own chief judge and to adopt by district court rule a procedure for conducting such an election were in direct conflict with Rule 107, which states that the Supreme Court will appoint a chief judge in each judicial district for a 2-year term beginning January 1 in an even-numbered year. The rule also provides that any current chief judge who wishes to serve a subsequent 2-year term must notify the Supreme Court on or before November 30 in an odd-numbered year of his or her desire.

12

Under the plain language of the Declaratory Judgments Act, Solomon has standing to challenge the constitutionality of sec. 11 because the statute undoubtedly affects his "rights, status or other legal relations" as the current chief judge of the 30th Judicial District. See K.S.A. 60-1704. Section 11 requires Solomon, along with the other judges in the 30th Judicial District, to develop and adopt a procedure for electing among themselves a chief judge prior to January 1, 2016. Because sec. 11 conflicts with Rule 107, Solomon undoubtedly faces uncertainty and insecurity as to whether he should implement a procedure for electing a chief judge or whether he should proceed under Rule 107 and inform this court as to whether he wishes to serve another 2-year term. The dilemma Solomon currently faces is of the nature that the Declaratory Judgments Act was specifically enacted to resolve. See K.S.A. 60-1713 (act is remedial in nature and its purpose is "to settle and provide relief from uncertainty and insecurity with respect to disputed rights, status and other legal relations"; should be liberally construed and administered to achieve that purpose).

The State notes that, the language of the Declaratory Judgments Act notwithstanding, the caselaw of this state still requires that a declaratory judgment action involve an actual case or controversy. See, *e.g.*, *State ex rel. Morrison v. Sebelius*, 285 Kan. 875, 897, 179 P.3d 366 (2008) (actual cases and controversies are required in declaratory judgment cases); *Wagner v. Mahaffey*, 195 Kan. 586, 589, 408 P.2d 602 (1965) (well established in this jurisdiction that even in declaratory judgment actions involving the validity of a statute there must be actual controversy between parties). In order for a legal dispute to present a case or controversy (*i.e.*, be justiciable) under Kansas law, it must satisfy four elements: (1) the plaintiff must have standing; (2) the issue raised cannot be moot; (3) the issue must be ripe, having taken fixed and final shape rather than remaining nebulous and contingent; and (4) the issue cannot present a political question. See *Gannon*, 298 Kan. at 1119; *Sebelius*, 285 Kan. at 891-92. Again,

13

the State argues that this matter does not present a justiciable case or controversy because (1) Solomon lacks standing and (2) his claim is not yet ripe.

Under Kansas law, in order to establish standing, a plaintiff must show that (1) he or she suffered a cognizable injury and (2) there is a causal connection between the injury and the challenged conduct. *Kansas Bldg. Industry Workers Comp. Fund v. State*, 302 Kan. 656, 678, 359 P.3d 33 (2015); *Gannon*, 298 Kan. at 1123. And in order to establish a cognizable injury, a party must show "a personal interest in a court's decision and that he or she personally suffers some actual or threatened injury as a result of the challenged conduct." *Sierra Club v. Moser*, 298 Kan. 22, 33, 310 P.3d 360 (2013). With regard to whether a matter is ripe for adjudication, we have stated:

> "As a general rule the courts will not give a construction to or declare the rights of parties upon a state of facts which has not arisen, nor upon a matter which is future, contingent, and uncertain, unless a present right depends upon the decision or there are other special circumstances to satisfy the court that it is desirable at once to decide on the future rights." *Woolums v. Simonsen*, 214 Kan. 722, Syl. ¶ 5, 522 P.2d 1321 (1974).

The State argues that because Solomon has not lost and may never lose his position as chief judge as a result of sec. 11 going into effect, he has not suffered a cognizable injury that would give him standing to challenge sec. 11 in a declaratory judgment action. For the same reason, the State argues that the matter is not ripe for adjudication.

In making this argument, the State suggests that the only injury Solomon could suffer that would give him standing and make this matter ripe is the loss of his position as chief judge. But this assertion frames the injury inquiry too narrowly. The State fails to acknowledge that sec. 11, as already noted, places an additional burden upon Solomon by directing him, along with the other judges in the 30th Judicial District, to develop and

14

adopt a new district court rule establishing a chief judge election procedure prior to January 1, 2016.

Although Rule 105 (2015 Kan. Ct. R. Annot. 200) provides that local district court rules are adopted by a majority vote of district court judges within a judicial district, Solomon, as chief judge, is personally tasked with marshalling the process to adopt the required court rule. See K.S.A. 2014 Supp. 20-342 ("After consultation with the district magistrate judges of such court, each district court, by action of a majority of the district judges thereof, may promulgate such rules as may be necessary *to provide for the administrative operations of such court . . . .*" [Emphasis added.]); Supreme Court Rule 105(a)(2) (2015 Kan. Ct. R. Annot. 200) ("After consultation with the district magistrate judges, the district judges of a judicial district, by majority vote, may adopt rules that are . . . *necessary for the judicial district's administration.*" [Emphasis added.]); Supreme Court Rule 107(b)(1) (2015 Kan. Ct. R. Annot. 202) ("The chief judge is responsible for and has supervisory authority over the court's *clerical and administrative functions.*" [Emphasis added.]). Additionally, because sec. 11 conflicts with Rule 107, Solomon faces a dilemma between his official duties that is personal to him: should he go forward with implementing a new procedure for electing a chief judge, or should he proceed under Rule 107?

Accordingly, we conclude that Solomon has suffered a specific, personal, and cognizable injury as a result of sec. 11 taking effect. He therefore has standing to bring a declaratory judgment action challenging the constitutionality of sec. 11. Because no additional facts need to arise or be developed in the record, the matter also is ripe for adjudication.

SEPARATION OF POWERS

The Kansas Constitution vests in the Supreme Court general administrative authority over all courts in this state. Solomon contends H.B. 2338 represents an impermissible invasion by the legislature of the Supreme Court's constitutional administrative authority.

Whether a statute is constitutional is a question of law subject to de novo review. *State ex rel. Six v. Kansas Lottery*, 286 Kan. 557, 562, 186 P.3d 183 (2008). A statute is presumed to be constitutional, and all doubts must be resolved in favor of constitutionality. If a court can find any reasonable way to construe a statute as constitutionally valid, it must do so. *Sebelius*, 285 Kan. at 883-84. Before a statute may be struck down, the constitutional violation must be clear. *Leek v. Theis*, 217 Kan. 784, 792, 539 P.2d 304 (1975).

The 1972 amendment to Article 3, § 1 of the Kansas Constitution vested in the Supreme Court "general administrative authority over all courts in this state." That phrase is not defined within the provisions of the constitution. In the absence of defining language, constitutional language is deemed "'to mean what the words imply to the common understanding of men. In ascertaining the meaning of a constitutional provision courts consider the circumstances attending its adoption and what appears to have been the understanding of the people when they adopted it.'" *Leek,* 217 Kan. at 793 (quoting *Higgins v. Cardinal Manufacturing Co.*, 188 Kan. 11, Syl. ¶ 2, 360 P.2d 456, *cert. denied* 368 U.S. 829 [1961].

The history of the 1972 amendment, based on the recommendations of the Citizens' Committee on Constitutional Revision outlined above, demonstrates unmistakably that the voting citizens understood that the "general administrative

16

authority" included the power to make rules for process, practice, and procedure at all levels of the unified court system.

Immediately following the adoption of the 1972 amendment, the Judicial Study Advisory Committee emphasized that the amendment was grounded in part on the need for clear lines of responsibility and authority in the administration of district courts ultimately leading back to the Supreme Court. For that reason, appointment procedures and the assignment of judges were the responsibility of the chief justice, subject to the Supreme Court's policy-making authority, under the new constitutional provision. The administrative and appointment powers were considered inherent.

The written constitution is paramount law because it emanates directly from the people. *In re Tax Application of Lietz Constr. Co.,* 273 Kan. 890, 903, 47 P.3d 1275 (2002). As a general rule, the legislature may enact legislation to facilitate or assist in the operation of a constitutional provision, but such legislation must be in harmony with and not in derogation of the constitution. *State, ex rel., v. Board of Education*, 212 Kan. 482, 488, 511 P.2d 705 (1973). A review of the history of the rules governing the appointment of what are now known as chief judges reveals such a harmony between the procedures set up by the Supreme Court and the laws enacted by the legislature.

Following the passage of the Judicial Department Reform Act, the Supreme Court adopted rules implementing the act, including a rule for assigning an administrative judge designated by the Supreme Court. The legislature then codified that rule. The legislature subsequently formed a citizens' committee to make recommendations regarding efficiency and administration of justice. Included in the recommendations of that committee was the establishment of a unified court, vesting in the Supreme Court supervisory and administrative authority. The legislature adopted the recommendations of

the committee and offered to the voters of this state a constitutional amendment that provided the Supreme Court with the authority the citizens' committee called for.

After the voters approved this amendment, the legislature formed an advisory committee to assist it with implementing reforms consistent with the new constitutional language. The committee recommended, among other things, that supervisory authority over all matters lie with the Supreme Court, including the assignment of judges at all levels and the appointment of chief judges. Consistent with these recommendations, the Supreme Court promulgated Rule 107, and, consistent with both the report of its own advisory committee and with the Supreme Court's exercise of its new constitutional directive, the legislature codified that rule in K.S.A. 20-329. This history demonstrates that the judicial branch and the legislature acted cooperatively to carry out the will of the voters of this State in establishing an efficient, capable, and unified independent judicial branch.

The doctrine of independent governmental branches is firmly entrenched in United States and Kansas constitutional law. As early as *Hayburn's Case*, 2 U.S. (2 Dall.) 409, 410, 1 L. Ed. 436 (1792), the United States Supreme Court declared that "by the Constitution of the United States, the government thereof is divided into *three* distinct and independent branches, and that it is the duty of each to abstain from, and to oppose, encroachments on either." A century later, in *Kilbourn v. Thompson*, 103 U.S. 168, 190-91, 13 Otto 168, 26 L. Ed. 377 (1880), the Court stated:

> "It is believed to be one of the chief merits of the American system of written constitutional law, that all the powers intrusted to government, whether State or national, are divided into the three grand departments, the executive, the legislative, and the judicial. That the functions appropriate to each of these branches of government shall be vested in a separate body of public servants, and that the perfection of the system requires

18

that the lines which separate and divide these departments shall be broadly and clearly defined. It is also essential to the successful working of this system that the persons intrusted with power in any one of these branches shall not be permitted to encroach upon the powers confided to the others, but that each shall by the law of its creation be limited to the exercise of the powers appropriate to its own department and no other."

As it pertains to the doctrine of separation of powers, the Kansas Constitution is almost identical to the federal Constitution. *Gleason v. Samaritan Home*, 260 Kan. 970, 982, 926 P.2d 1349 (1996). The doctrine is an inherent and integral element of the republican form of government and is expressly guaranteed to the states by the federal Constitution. 260 Kan. at 982.

The Kansas Supreme Court has the authority and duty to preserve the constitutional division of powers against disruptive intrusion by one branch of government into the sphere of a coordinate branch of government.

"The supreme court, in the exercise of its jurisdiction given to it by the constitution and the statutes, may protect its own jurisdiction, its own process, its own proceedings, its own orders, and its own judgments; and may, in cases pending before it, prohibit or restrain the performance of any act which might interfere with the proper exercise of its rightful jurisdiction in such cases." *C.K.&W. Rld. Co. v. Comm'rs of Chase Co.*, 42 Kan. 223, Syl. ¶ 1, 21 P. 1071 (1889).

"It can hardly be supposed that the action of the supreme court may be thwarted, impeded, or embarrassed by the unwarranted intermeddling of others without any power in the supreme court to prevent it." 42 Kan. at 225.

Solomon contends that, by enacting sec. 11 of H.B. 2338, the legislature improperly exerted control over an administrative function of the Supreme Court that is

constitutionally reserved to the judicial branch. One department of government usurps the powers of another department when it exercises coercive influence on the other. *State, ex rel., v. Bennett*, 219 Kan. 285, 290, 547 P.2d 786 (1976). In order for the interference by one department with the operations of another department to be unconstitutional, the intrusion must be significant. 219 Kan. at 290.

In granting Solomon's summary judgment motion, the district court gave great weight to a simple test for determining whether a legislative act violates the separation of powers doctrine. This test was derived from *State v. Mitchell*, 234 Kan. 185, 195, 672 P.2d 1 (1983), where language can be found asserting that, when court rules and a statute are in conflict, the constitutional mandate of the Supreme Court must prevail. Although the district court applied this language, and although the parties argue vigorously about whether *Mitchell* provides a bright-line test, we see no need to rely upon *Mitchell* in resolving the matter before us. Other bases are readily available for analyzing separation of powers disputes, and these guidelines provide a more thorough and nuanced demonstration that constitutional lines of authority have been crossed.

In reviewing whether one branch of government has significantly interfered with the operations of another to the point of violating the doctrine of separation of powers, courts commonly consider four factors: (1) the essential nature of the power being exercised; (2) the degree of control by one branch over another; (3) the objective sought to be attained; and (4) the practical result of blending powers as shown by actual experience over a period of time. *Miller v. Johnson*, 295 Kan. 636, 671, 289 P.3d 1098 (2012); *Sebelius*, 285 Kan. at 884; *Bennett*, 219 Kan. at 290-91.

Applying these factors to the present case, the first factor relates to the essential power being exercised. Article 3, § 1 of the Kansas Constitution grants the Supreme Court "general administrative authority over all courts in this state." Here, the essential

power is the administration of district courts and administrative positions within those courts, which are guided by chief judges. The Supreme Court's general administrative authority has been defined as the power "to promulgate and enforce reasonable rules regulating judicial administration and court procedure as necessary for the administration of justice." *Mitchell*, 234 Kan. at 194. At issue before us is the question of to whom a chief judge must respond and in which direction lines of authority flow—to other judges in the district or to the Supreme Court? The State maintains that the focus should be on the distinction between administrative authority and legislative power to govern administration. Solomon argues that the nature of the power here being exercised is fundamentally one of court administration. We agree with Solomon.

The district court, after noting the fundamental disagreement about the nature of the power at issue, analyzed the powers and duties of a chief district court judge and found that "there is little doubt that the fundamental nature of the position is administrative. Put another way, the position of chief district court judge is one of the principal instruments through which the Kansas Supreme Court's constitutionally granted 'general administrative authority' over the courts in Kansas is wielded."

After addressing the State's argument analogizing the constitutional power of the Governor, codified at Article 1, § 3 of the Kansas Constitution, and that of the Kansas Supreme Court, an argument the State similarly puts forth before this court, the district court concluded: "Thus, while the [governor's] administrative authority contained in the 'supreme executive power' may be implicit, the Kansas Supreme Court has been given constitutionally *explicit* 'general administrative authority.' This distinction renders the Defendant's comparison to the relationship between the Executive and Legislative branches of government unavailing." We see no purpose in repeating the sound reasoning of the district court on this factor and conclude that the selection of a chief district court judge is an essential power more closely related to the Supreme Court's general

21

administrative authority than to the legislature's power to appoint. We further note that the legislature in H.B. 2338 empowered these locally selected chief judges with new discretionary responsibilities regarding district court budget expenditures, compensation to be paid to district court personnel, as well as the power to hire, promote, suspend, demote, and dismiss all personnel as necessary to carry out the functions and duties of each judicial district. See K.S.A. 2014 Supp. 20-384. Such provisions would only further fragment what is constitutionally designed to be a unified state court system and harken back to the days of pre-1972 court administration.

The second factor relates to the degree of control exerted by the legislature over the judiciary. Having found that the position of chief judge is an essential component of the Supreme Court's constitutionally derived general administrative authority, we conclude that the legislative interference represents a direct and explicit removal of appointing authority from the Supreme Court and dilutes the Supreme Court's authority over the administration of district courts. This authority is a function this court has exercised since unification nearly 50 years ago, and both the removal of this authority is in derogation of the both the explicit language of our State's constitution and in opposition to the will of the electorate as expressed in the recommendations of the citizens' committees that led to both the constitutional amendment and the enabling legislation. The goal of the 1972 amendment to the constitution was both explicitly and implicitly to unify the court system. The intervention by the legislature in 2014 would result in removal from the Supreme Court of an essential component of its constitutionally mandated administrative authority. By taking the power to appoint chief judges away from the Supreme Court, the legislature has exerted its power over a fundamental component of the judiciary.

The third factor looks to the objective sought by the statute. Both parties and the district court agreed that this factor is "'perhaps the least important'" inquiry into whether

or not a violation of the separation of powers has occurred because "'a bill that significantly interferes with the Kansas Supreme Court's administrative authority surely cannot be salvaged by a worthy motive, or vice versa.'" The State suggests the legislature was likely influenced by written testimony of four 18th Judicial District judges who stated chief judges should be selected by peers, who know them best and work with them most closely. One also asserted that the measure would return control of local judicial districts to those districts. This second objective is directly contrary to the aim of the 1972 constitutional amendment, which sought to reduce "fragmentation of judicial power" and the concomitant "unnecessary variations in the practices and procedures of individual local courts." Such an objective is also radically at odds with the "clear lines of responsibility and authority" advocated by the legislature's own Judicial Study Advisory Committee.

The fourth factor, the practical result of the blending of constitutional powers as evidenced by experience, is difficult to evaluate. To the extent that our research has been able to ascertain, Kansas has never provided for the local election of chief judges by their peers. The State suggests that nearby states have had statutory schemes in place for years that are similar to the one at issue here. We have no information, however, regarding whether the duties associated with those similarly titled positions in other states are equivalent to responsibilities entrusted to chief judges in Kansas. Further, there is no indication in the caselaw of those states of litigation challenging administrative efficiency of those statutes. But caselaw from other jurisdictions reveals several decisions in which similar encroachments violated the separation of powers doctrine. (See cases cited below.) In any event, the statute at issue before us now does not involve a "blending" of legislative and judicial powers; it represents a direct replacement of judicial authority by legislative authority.

Application of these four factors strongly suggests that sec. 11 represents an impermissible intrusion on the part of the legislative branch into the constitutionally mandated administrative authority of the Supreme Court. This conclusion is supported by decisions in several of our sister states. While none is exactly on point, each informs us that the appointing power of the Supreme Court is essential to its effective administration of the judicial system.

In *Judicial Attorneys Ass'n v. Michigan*, 459 Mich. 291, 586 N.W.2d 894 (1998), the Michigan Supreme Court considered a statute that designated counties to be the employers of court employees and divided personnel responsibilities between the counties and the chief judges. The court held that the powers of the judicial branch necessarily include the administrative function of controlling those who work within the judicial branch, and the statutory scheme impermissibly encroached on the judicial branch. 459 Mich. at 297-98, 301.

In *Petition of Governor & Executive Council*, 151 N.H. 1, 846 A.2d 1148 (2004), the New Hampshire Supreme Court considered a statute declaring the office of chief justice to be an administrative position and providing for justices to serve rotating 5-year terms as chief justice in order of seniority. The court found the statute to be an unconstitutional encroachment on the administrative authority of the supreme court. The court warned that giving the legislature license to alter the means of appointment and the term of the chief justice would subject the judiciary to the "politics of the moment." 151 N.H. at 10.

In *In re P.L. 2001, Chapter 362*, 186 N.J. 368, 895 A.2d 1128 (2006), the New Jersey Supreme Court considered the constitutionality of a statute establishing a unit of armed probation officers within the administrative office of the courts. The court

24

concluded that "[b]ecause the Act fatally compromises the independence of the judiciary, and hopelessly blurs the line between the role of our courts and law enforcement, we have no choice but to declare the Act unconstitutional." 186 N.J. at 373. Considering state constitutional language similar to that in the Kansas Constitution, the court determined that its constitution gave "the Chief Justice and the Supreme Court sweeping authority to govern their own house." 186 N.J. at 379. The court stated that "it is the Court's power over administration that permits it to define the terms and conditions of employment of judiciary personnel and the functions they serve within the court system." 186 N.J. at 381. The state supreme court's authority over administration "is 'unfettered' and 'plenary,' in contrast to its authority over practice and procedure, which is 'subject to law.'" 186 N.J. at 382.

In *County of Erie et al. Appeal*, 93 Pa. Commw. 258, 501 A.2d 697 (1985), the Pennsylvania Commonwealth Court considered a county-enacted nepotism rule that the county personnel director sought to enforce against court employees. A district court judge appointed a probation officer, and the county attempted to enjoin the appointment because of a conflict with the nepotism rule. The appellate court held that the rule "affects the power of the judiciary to hire, fire and supervise court-appointed personnel" and it therefore was "constitutionally inapplicable to such personnel as are court-appointed." 93 Pa. Commw. at 261. Where "the hiring, firing and supervision of court-appointed personnel is concerned," "any law which encroaches upon or affects this power must be struck down unless there exists independent constitutional authorization." 93 Pa. Commw. at 262-63.

In *State v. McLeod*, 274 S.C. 81, 261 S.E.2d 303 (1979), the attorney general in South Carolina brought a declaratory judgment action seeking judicial determination of the constitutionality of a statute that provided for the chief justice of the state supreme

25

court to appoint circuit court judges to preside over public utility rate cases before the utility commission. The court held that the statute impermissibly encroached on the authority of the executive branch; it also infringed on the authority of the judicial branch to allocate judicial duties. 274 S.C. at 85.

In *State v. Riley*, 274 S.C. 106, 262 S.E.2d 404 (1980), the South Carolina Supreme Court addressed the constitutionality of a legislatively created court of appeals. The supreme court generally upheld the legislature's authority to create such an appellate court, but it held that certain provisions of the statute violated the doctrine of separation of powers. A provision granting power to the chief judge of the court of appeals to assign circuit judges to sit with the court unconstitutionally infringed on the constitutional power of the chief justice of the supreme court to assign judges to sit in any court within the unified judicial system. 274 S.C. at 112. The statute vesting the court of appeals with the power to set additional terms for that court unconstitutionally infringed on the authority of the chief justice of the supreme court, as the administrative head of the unified judicial system, to set terms of any court within the unified system. 274 S.C. at 112-13. Finally, a provision that records of the court of appeals should be kept in a manner prescribed by the judges violated the constitutional article providing that the supreme court should make rules governing the administration of all the courts of the state. 274 S.C. at 114.

In *State ex rel. Crabtree v. Hash*, 180 W. Va. 425, 376 S.E.2d 631 (1988), the West Virginia Supreme Court considered the appointment powers of the state's chief justice. A state statute authorized the local bar to elect a judge if a district court judge was disqualified or otherwise unable to conduct court. The supreme court promulgated a rule giving the chief justice the power to assign temporary circuit judges. The state constitution, like that of Kansas, explicitly made the chief justice the "administrative head of all courts." The constitution also allowed the chief justice to assign judges from one

court to another and explicitly stated that supreme court rules supersede any statutes that conflict with those rules. 180 W. Va. at 426-27. Relying on those provisions, the supreme court found sufficient conflict between rules and statutes to hold the statute to be an unconstitutional encroachment on the authority of the supreme court. 180 W. Va. at 428.

The language of our constitution and application of caselaw factors for analyzing issues in cases involving separation of powers leads us to an ultimate opinion that is consistent with the opinions of courts in other jurisdictions: the means of assigning positions responsible to the Supreme Court and charged with effectuating Supreme Court policy must be in the hands of the Supreme Court, not the legislature. By enacting sec. 11 of H.B. 2338, the legislature asserted significant control over a constitutionally established essential power of the Supreme Court. Unlike previous legislation which was enacted in harmony with Supreme Court rules, sec. 11 directly conflicts with the mission of the Supreme Court in establishing an efficient and unified administrative structure for the courts. Courts in other jurisdictions have reached analogous conclusions about legislative interference with the administration of courts.

Before closing, we mention two final, specific points. First, the State would have us hold that Article 15, § 1 of the Kansas Constitution governs. It provides that the legislature may prescribe the appointment of officers whose election or appointment is not otherwise provided for by law. This argument is untenable because the position of chief judge is not a public officer. At common law, the markers for service as a public officer were a publicly provided salary, the exercise of some element of sovereign power, the taking of an oath of office, and service for a predetermined term. See *Markham v. Cornell*, 136 Kan. 884, 897-98, 18 P.2d 158 (1933); *In re Carroll*, 91 Kan. 395, 398, 137 P. 975 (1914); *Moore v. Nation*, 80 Kan. 672, 673, 103 P. 107 (1909); see also K.S.A. 75-4308 (requiring oath of office); *Farley v. Board of Education of City of Perry*, 62 Okla. 181, 183, 162 P. 797 (1917); *Gracey v. St. Louis*, 213 Mo. 384, 393, 111 S.W. 1159

27

(1908); *Baltimore City v. Lyman*, 92 Md. 591, 594, 48 A. 145 (1901); *State of Iowa v. Spaulding*, 102 Iowa 639, 647-48, 72 N.W. 288 (1897); *People v. Myers*, 33 N.Y. St. Rep. 18, 11 N.Y.S. 217, 218 (1890). Chief judges, as independent officials, are not subject to a particular oath requirement, in that they take no oath of office beyond their oaths as judges. See K.S.A. 25-2807; see also *Moore*, 80 Kan. 672, Syl. ¶¶ 1, 3 (additional duties assigned to judge do not create separate office for that judge). Further, sec. 11 would set no term for chief judges. Because a chief judge does not occupy an office distinct from the office of district court judge, Article 15, § 1 does not apply to the appointment of chief judges.

Second, we note that the district court relied on sec. 43 of H.B. 2338, a nonseverability clause, to strike the legislation in its entirety. Neither party has challenged the validity of that portion of the district court ruling, and we accordingly do not address it here. We note only that our holding appears to have practical adverse consequences to the judiciary budget, which the legislature may wish to address, even though those concerns played no part in our analysis.

CONCLUSION

We agree with the district court that sec. 11 of H.B. 2338 is unconstitutional, and we hold that Rule 107 remains in full effect. The decision of the district court is affirmed.

NUSS, C.J., not participating.
MICHAEL J. MALONE, Senior Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:**  Senior Judge Malone was appointed to hear case No. 114,573 vice Chief Justice Nuss under the authority vested in the Supreme Court by K.S.A. 20-2616.

28

* * *

STEGALL, J., concurring: I concur with and join the portion of today's decision concerning Judge Solomon's standing to bring this declaratory judgment action. But I cannot join the portion of this opinion dedicated to deciding the merits of Judge Solomon's claims. While I concur in the result of today's decision—I too find that K.S.A. 2014 Supp. 20-329 violates the structural separation of powers dictated by our constitution—I write separately because, unfortunately, the decision of the majority does little to restore the proper sequestering of the three great governmental powers within their respective departments.

To the contrary, a majority of the court has today recapitulated a jurisprudence more properly described as promoting a "harmony of powers" than a separation thereof. It is true, we have rejected a specific mixing of powers. But we have left undisturbed and uncriticized legislative acts (such as creating a judicial position with additional duties and additional pay) that are, while perhaps more felicitous to judicial interests, equally offensive to the separation of powers. In so doing we demonstrate that we will look askance at such mixing only when it comes at the expense of cherished departmental powers.

INTRODUCTION

"Something there is that doesn't love a wall / That wants it down," observed Robert Frost, blaming nature's assault—winter's "frozen ground swell." Robert Frost, *Mending Wall,* in *North of Boston* 11-13 (1917). As with nature, so too with governments. There is something about power that doesn't love a wall; that wants it down. It is in the centripetal nature of governmental power—if dispersed like so many

29

iron filings across a surface—to be restless until it is united in one place, as though drawn by an unseen magnet beneath. See, *e.g.*, James Madison, The Federalist No. 51, p. 321 (C. Rossiter ed. 1961) (warning against the "gradual concentration of the several powers in the same department" of government).

Knowing this—and having a healthy fear of consolidated power—the drafters of both our national and our state constitutions structured our government to be crisscrossed by numerous "walls of separation." The most important of these walls of separation are those that both hem in and protect the exercise of the three distinct forms of governmental power in our constitutional system—the executive, the legislative, and the judicial powers.

This "separation of powers" that divides our three co-equal departments of government—while nowhere explicitly set forth in the United States or Kansas constitutions—has been variously described as "inherent," "integral," and "firmly entrenched in United States and Kansas constitutional law." See *Solomon v. State,* slip op. at 18-19; see also James Madison, The Federalist No. 47, p. 301 (C. Rossiter ed. 1961) ("No political truth is certainly of greater intrinsic value, or is stamped with the authority of more enlightened patrons of liberty than [the separation of powers]. . . .The accumulation of all powers, legislative, executive, and judiciary, in the same hands, . . . may justly be pronounced the very definition of tyranny."). But as Frost understood, walls fall down. And within our constitutional system, it is the duty of the courts to not only stand guard over the integrity of our governmental walls of separation, but also, as time and neglect may require, to rebuild them.

A Short Review of Our 20th Century Separation of Powers Jurisprudence

In the decades following statehood, this court routinely adhered to a principle of strict separation of powers as illustrated by our turn-of-the-century decision in *State v. Johnson*, 61 Kan. 803, 60 P. 1068 (1900). In *Johnson*, we struck down a legislative conferral upon the judiciary of the legislative power to set railroad rates, holding that "the functions of the three departments should be kept as distinct and separate as possible, except so far as the action of one is made to constitute a restraint upon the action of the other." 61 Kan. at 814. The remainder of the century would not prove so solicitous to our constitutional structure.

By the 1950s, this court was regularly refusing to strike down governmental combinations of power in one place, often in the name of what was "practicable." See, *e.g.*, *State ex rel. Hawks v. City of Topeka*, 176 Kan. 240, 245, 270 P.2d 270 (1954) (upholding an act granting power to cities to acquire real estate for off-street parking by eminent domain on the grounds that "'the absolute independence of the departments and the complete separation of the powers is impracticable, and was not intended'") (quoting *In re Sims*, 54 Kan. 1, 11, 37 P. 135 (1894) [Johnston, J., concurring]); *State ex rel. Anderson v. Fadely*, 180 Kan. 652, 695-96, 308 P.2d 537 (1957) (upholding an act creating the State Finance Council, holding "it cannot be overlooked as a practical matter that as between the legislative and the executive departments of our government the enactment contemplates comity and cooperation and not a blending of powers").

By 1976, our new practical approach to determining when a government combination of power had become too great dictated that we create a legal test, and in *State ex rel Schneider v. Bennett*, 219 Kan. 285, 547 P.2d 786 (1976), we settled on a four-factor test—the same test the majority applies today—intended to establish whether

any specific combination created a "significant interference" with the independent function of any department of government. Along the way, we stated:

> "Although the theoretical separation of powers of government was strictly enforced in our early history without qualification, the more recent cases have modified the doctrine and applied a more practical approach. . . ."

> "In our judgment a strict application of the separation of powers doctrine is inappropriate today in a complex state government where administrative agencies exercise many types of power including legislative, executive, and judicial powers often blended together in the same administrative agency. The courts today have come to recognize that the political philosophers who developed the theory of separation of powers did not have any concept of the complexities of government as it exists today. Under our system of government the absolute independence of the departments and the complete separation of powers is impracticable. We must maintain in our political system sufficient flexibility to experiment and to seek new methods of improving governmental efficiency." *Bennett*, 219 Kan. at 288-89.

A few years later, we reiterated:

> "[A]n entire and complete separation is [n]either desirable [n]or was ever intended by the framers of the Constitution. The fact that the powers of one department may overlap with another department's powers has long been a recognized fact. Throughout the judicial history of this state early decisions attempted to apply the doctrine strictly, refusing to tolerate any overlapping of powers. *State v. Johnson*, 61 Kan. 803, 60 P. 1068 (1900). The more recent cases have modified the doctrine, taking a more pragmatic, flexible and practical approach giving recognition to the fact there may be a certain degree of blending or admixture of the three powers of government and that absolute separation of powers is impossible. [Citations omitted.]" *State v. Greenlee*, 228 Kan. 712, 715-16, 620 P.2d 1132 (1980).

Contrary to our history of casually dismissing the "theory" behind our constitutional structure, we should have paused somewhere along this path and soberly reflected that "[t]o the Framers, the separation of powers and checks and balances were more than just theories. They were practical and real protections for individual liberty in the new Constitution." *Perez v. Mortgage Bankers Assn.*, 575 U.S. ___, ___, 135 S. Ct. 1199, 1216, 191 L. Ed. 2d 186 (2015) (Thomas, J., concurring). But—in the absence of such reflection—the death blow to *Johnson* and our early separation of powers jurisprudence finally arrived in *State v. Mitchell*, 234 Kan. 185, 193, 672 P.2d 1 (1983).

In *Mitchell*, this court was required to determine "whether the Supreme Court has exclusive constitutional power to make rules pertaining to court administration." 234 Kan. at 193. In deciding whether a legislative enactment dictating a rule of court procedure violated the separation of powers, the *Mitchell* court held that "[a]lthough the Supreme Court has the constitutional power to determine court procedure, it may cooperate with the legislature in the exercise of that power. The Supreme Court's acquiescence [to the statute in question] is an example of cooperation." *Mitchell*, 234 Kan. 185, Syl. ¶ 7. The *Mitchell* court followed the logic of this holding through to its inevitable conclusion, reasoning that because "the judiciary can acquiesce in legislative action" which dictates aspects of "the judicial function," a "problem" only emerges "when court rules and a statute conflict"; and in "such circumstances," the court's rule "must prevail" and the statute must give way. *Mitchell*, 234 Kan. at 195.

*Mitchell* is the culmination of decades of our "straying further and further from the Constitution without so much as pausing to ask why." *Michigan v. E.P.A.*, 576 U.S. ___, ___, 135 S. Ct. 2699, 2714, 192 L. Ed. 2d 674 (2015) (Thomas, J., concurring). Its rule that the constitutional separation of powers can essentially be *waived* by the departments of government whenever they find such separation an inconvenient impediment to some sought-after governmental end misapprehends and may fatally undermine the

33

fundamental purpose of such walls of separation in the first instance—to prevent the "gradual concentration of the several powers in the same department" which "may justly be pronounced the very definition of tyranny." *Madison*, at 301.

The separation of powers contains no opt-out clause. The departments are not free to ignore the strictures of separate powers upon a mutual declaration of cooperation in furtherance of some jointly agreed upon governmental objective. And if there *is* such an opt out, upon what grounds other than the arbitrary whim of one department refusing to cooperate could a violation of the separation of powers ever be found? In a government founded upon and itself governed by the rule of law, the governmental departments "cannot by agreement alter the constitutional structure." *NLRB v. Noel Canning*, 573 U.S. ___, ___, 134 S. Ct. 2550, 2594, 189 L. Ed. 2d 538 (2014) (Scalia, J., concurring)

### K.S.A. 2014 SUPP. 20-329 DOES NOT VIOLATE THE FOUR-FACTOR *BENNETT* TEST

However, as discussed above, our precedent has established that in Kansas the departments *may* in fact alter our constitutional structure so long as such alteration is not "significant." In *Bennett*—relying on our dismissal of the antiquated theory of separation of powers as it was actually embedded into our constitutional structure by the drafters of our governmental charters—we established a four-part test to determine when the "flexibility to experiment" in the name of "governmental efficiency" has gone too far and created a "significant interference" with the separation of powers:

> "First is the essential nature of the power being exercised. Is the power exclusively executive or legislative or is it a blend of the two? A second factor is the degree of control by the legislative department in the exercise of the power. Is there a coercive influence or a mere cooperative venture? A third consideration of importance is the nature of the objective sought to be attained by the legislature. Is the intent of the legislature to cooperate with the executive by furnishing some special expertise of one or

more of its members or is the objective of the legislature obviously one of establishing its superiority over the executive department in an area essentially executive in nature? A fourth consideration could be the practical result of the blending of powers as shown by actual experience over a period of time where such evidence is available. *Bennett*, 219 Kan. at 90-91.

We thereby "replaced the clear constitutional prescription" demanding the sequestering of powers into three separate co-equal and coordinate branches "with a 'balancing test.'" See *Morrison v. Olson*, 487 U.S. 654, 711, 108 S. Ct. 2597, 101 L. Ed. 2d 569 (1988) (Scalia, J., dissenting). Thus, following *Bennett* and its progeny, in the name of balance, cooperation, and harmony, we have permitted breaches of the walls of separation between the departments so long as no single breach is determined to be "significant." The majority today applies the four-factor *Bennett* test to find that K.S.A. 2014 Supp. 20-329 amounts to a "significant" interference with the judicial department and is therefore unconstitutional.

This holding, however, cannot be reconciled with the facts before us—especially in light of our prior decisions discussed above refusing to strike down far *more* significant interferences. For example, in *State v. Reed*, 248 Kan. 792, 793, 800, 811 P.2d 1163 (1991), we upheld a statute providing "that a district court shall modify a defendant's sentence when recommended by the [executive branch] unless specific findings are made by the trial court." To reach this result, we applied the first *Bennett* factor and found no violation because the judiciary retained the final discretion regarding sentence. As such, we found the essential "nature" of the power being exercised was cooperative and "advisory." 248 Kan. at 800. Similarly, when considering the second factor, the *Reed* court did not find an unlawful level of control over judicial discretion but rather found that the statute merely "channels the discretionary authority of the court." 248 Kan. at 801.

35

By the same token—when viewed in a light most favorable to upholding the constitutionality of the law as the majority states it is doing—K.S.A. 2014 Supp. 20-329 could reasonably be characterized as a cooperative effort to advise and channel the administrative power of the Supreme Court. After all, as the State has repeatedly pointed out, the appointment power is still being exercised entirely within the judicial branch and the actual performance of judicial administrative duties remains entirely subject to the ultimate authority of the Supreme Court. Moreover, the legislature has exercised the same fundamental control over the position of chief judge since it began requiring this court to fill that position in each judicial district. L. 1976, ch. 146, sec. 28. Simply put, today's holding cannot be reconciled with Chief Judge Solomon's concession, and this court's implicit admission, that under the precedents of harmony, the legislature does in fact have the power to create the position of chief judge in the first instance and to assign duties of judicial administration to that position. In view of this, we today demonstrate that the standard by which we determine "significance" is simply "the unfettered wisdom of a majority of this Court." *Morrison*, 487 U.S. at 712 (Scalia, J., dissenting).

This difficult judgment is unavoidable, especially in light of the manner in which the majority opinion glosses quickly over the district court's application of *Mitchell* and the parties' focus on the meaning and application of the *Mitchell* rule. *Mitchell*'s transparent elevation of judicial policy to the level of constitutional law is perhaps more easy to forget than to confront because *Mitchell* rather bluntly (if impolitely) asserts what actually happens in the world *Bennett* established—a world in which judges "recognize" the naiveté of those who "developed the theory of separation of powers" but who had no "concept of the complexities of government as it exists today." *Bennett*, 219 Kan. at 288.

By rejecting the original strictures of the constitution, the *Bennett* court gave to itself—and to successive generations of judges and governmental officials—"sufficient flexibility to experiment and to seek new methods of improving governmental

36

efficiency." *Bennett*, 219 Kan. at 289. The consequences of this kind of constitutional amendment by experimentation are perfectly illustrated by *Mitchell*'s rule that a legislative enactment dictating a matter of judicial administration is either constitutional or unconstitutional depending on nothing more substantial than whether the Supreme Court agrees with the policy choices represented by the statute.

A QUESTION OF DEFERENCE

The descent of this court's separation of powers jurisprudence from *Johnson* to *Bennett* and *Mitchell* was aided in no small part by our application of judicial deference. We have routinely stated the rule that "[i]f there is any reasonable way to construe a statute as constitutionally valid, the court must do so." *Boatright v. Kansas Racing Comm'n*, 251 Kan. 240, 243, 834 P.2d 368 (1992). We have regularly repeated this rule in separation of powers cases, and we do so again today (though I find little evidence that the majority has made an effort to construe K.S.A. 2014 Supp. 20-329 as constitutionally valid in light of the four *Bennett* factors). See *Solomon v. State*, slip op. at 16.

This deferential rule and practice played a key role at the fulcrum of this particular history in this court's decision in *State ex rel. Anderson v. Fadely*, 180 Kan. 652. There, in a 4-2 decision, we ruled that the legislative act creating the State Finance Council did not violate the separation of powers. The *Fadely* majority relied heavily on our earlier decision upholding the Kansas Turnpike Authority in *State ex rel. Fatzer v. Kansas Turnpike Authority*, 176 Kan. 683, 273 P.2d 198 (1954)—a case that had been brought by then Attorney General Harold Fatzer. By the time *Fadely* was heard and decided, Fatzer had joined this court, and he wrote a lengthy dissent, joined by Justice Wertz, pleading for a return to the strict principles of separation of powers set forth in *Johnson* and other earlier cases. See generally *Fadely*, 180 Kan. at 668-89.

Fatzer was particularly aggrieved by the *Fadely* concurring opinion written by Justice Schroeder and joined by Justices Parker and Price. That concurring opinion was written specifically to push this court in the direction of what I have here called a doctrine of "harmony of powers." Objecting to Fatzer's citation of The Federalist Papers and other authority in the realm of political theory, Justice Schroeder wrote that the court "should not be overcome by the repetition of theory piled higher and higher in matters concerning the separation of powers before the facts and practical aspects of the problem have been thoroughly exploited by judicial thought." *Fadely*, 180 Kan. at 693.

Justice Schroeder went on to note that "it cannot be overlooked as a practical matter that as between the legislative and the executive departments of our government the enactment contemplates comity and cooperation and not a blending of powers." *Fadely*, 180 Kan. at 695-96. Finally, he concluded that—contrary to Justice Fatzer's concern that the Supreme Court was allowing "the power of one department to pour through like an on surging flood to engulf and submerge the power of another department" 180 Kan. at 668—the legislature was enacting "a cooperative proposition" and not engaged in a "usurpation of power." 180 Kan. at 696. Recognizing that a cooperative act in violation of the constitution is no less violative for being accomplished in the name of the general good and without opposition, Justice Fatzer responded that "we are dealing with an important and far-reaching constitutional question concerning a power of government which does not permit honesty, integrity, good intentions, a progressive enthusiasm, or even successful operation to take the place of essential constitutional action." *Fadely*, 180 Kan. at 688.

The *Fadely* concurrence relied heavily on the rule of deference to justify its dismissal of Justice Fatzer's constitutional concerns in favor of the "practical aspects of the problem." 180 Kan. at 693. For example, Justice Schroeder quoted from the *Fatzer* court's similarly deferential posture towards "questions of public policy [which] are for

38

legislative and not judicial determination, and where the legislature does so declare, and there is no constitutional impediment, the question of the wisdom, justice or expediency of the legislation is for that body and not for the courts." *Fatzer*, 176 Kan. at 695. On a six member court split 3-2 (Justice Hall did not participate) on the substantive question before it, Justice Robb stood to cast the deciding vote. Ultimately, he concurred in the result reached by Justices Schroeder, Parker, and Price. He did not join their separate opinion, however, because in substance, he agreed with Justice Fatzer's dissent, going so far as to write in his own separate opinion that "we cannot waive our constitutional provisions on the theory that even the constitution must bend to the public good." *Fadely*, 180 Kan. at 701. Nevertheless, he explained and justified his final vote in *Fadely* entirely on the grounds of deference: "I would be inclined to join in the dissent were it not for that long line of decisions of our court following the almost universal rule that an act of the legislature is presumed to be constitutional unless it contravenes an express inhibition of the constitution." *Fadely*, 180 Kan. at 698.

I agree with the recitation in *Fatzer* that it is within the province of the legislative department to "declare"—where "there is no constitutional impediment"—the "public policy" of this state. *Fatzer*, 176 Kan. at 695. Moreover, the doctrine of judicial deference to the legislative power to declare policy in the form of law-making is itself a vital aspect of the doctrine of separation of powers, prohibiting as it does the judicial department from "question[ing] the wisdom, justice or expediency of the legislation." *Fatzer*, 176 Kan. at 689. So while judicial deference to the exercise of legislative or executive powers is entirely meet and proper, the same deference shown to the legislative or executive *departments* when they act *outside* of their respective vested powers is, in actual fact, an abdication of the vested judicial power to say what the law is.

"We may not—without imperiling the delicate balance of our constitutional system—forgo our judicial duty to ascertain the meaning of the Vesting Clauses and to

adhere to that meaning as the law." *Department of Transportation v. Association of American Railroads*, 575 U.S. ___, ___, 135 S. Ct. 1225, 1246, 191 L. Ed. 2d 153 (2015) (Thomas, J., concurring). "[W]hen questions involving the Constitution's government-structuring provisions are presented in a justiciable case, it is the solemn responsibility of the Judicial Branch 'to say what the law is.'" *NLRB*, 134 S. Ct. at 2593 (Scalia, J., concurring) (quoting *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L. Ed. 60 [1803]). Moreover, the judiciary "does not defer to the other branches' resolution of such controversies. . . . Rather, policing the 'enduring structure' of constitutional government when the political branches fail to do so is 'one of the most vital functions of this Court.'" *N.L.R.B.*, 134 S. Ct. at 2593 (Scalia, J., concurring) (quoting *Public Citizen v. Department of Justice,* 491 U.S. 440, 468, 109 S. Ct. 2558, 105 L. Ed. 2d 377 [1989] [Kennedy, J., concurring in judgment]).

A short look, for example, at the all-too-common habit of legislative delegation of its exclusive power to make law to the vast apparatus of the administrative state may demonstrate the dangerous combinations of power that can grow up in the protective shadow of such judicial deference and judicial encouragement of cooperation between the departments. See, *e.g*., *Association of American Railroads*, 135 S. Ct. at 1246 (Thomas, J., concurring) ("Implicitly recognizing that the power to fashion legally binding rules is legislative, we have nevertheless classified rulemaking as executive (or judicial power) when the authorizing statute sets out 'an intelligible principle' to guide the rulemaker's discretion. . . . [I]t is evident that [the intelligible principle test] does not adequately reinforce the Constitution's allocation of legislative power. I would return to the original understanding of the federal legislative power and require that the Federal Government create generally applicable rules of private conduct only through the constitutionally prescribed legislative process.").

STRICTLY ENFORCING THE CONSTITUTIONALLY MANDATED
SEPARATION OF POWERS IN THIS CASE

Today we propagate our long-standing yet erroneous separation of powers jurisprudence. Worse, we have compounded our prior error by applying the precedent promoting "harmony" and "sharing" in such an arbitrary manner that we leave no doubt that the *Bennett* test for finding a "significant interference" is mere fig-leafing to cover our unsightly exercise of judicial willfulness.

I respectfully dissent from this approach because a consistent application of the four *Bennett* factors, colored by deferential review and in light of our prior precedent, would require that we uphold K.S.A. 2014 Supp. 20-329 as a constitutionally permissible less-than-significant exercise of "shared" powers of judicial administration. But rather than follow flawed precedent to a result that further erodes the constitutional separation of powers, I would instead adhere to the basic principle recognized by this court in *Johnson* that "the functions of the three departments should be kept as distinct and separate as possible." 61 Kan. at 814.

Stating the rule as clearly and succinctly as possible, I would hold that when "the Government is called upon to perform a function that requires an exercise of legislative, executive, or judicial power, only the vested recipient of that power can perform it." *Association of American Railroads*, 135 S. Ct. at 1241 (Thomas, J., concurring). This does not mean there can never be close or difficult cases in this arena, however, because some "functions may be performed by two or more branches without either exceeding its enumerated powers under the Constitution. . . . The question is whether the particular function requires the exercise of a certain type of power; if it does, then only the branch in which that power is vested can perform it." *Association of American. Railroads*, 135 S. Ct. at 1241-42 (Thomas, J., concurring).

41

Furthermore, I would return this court to the active judicial role and obligation to guard and protect a clear and strong wall of separation between each of the three great departments of government—keeping each within its proper province and protecting those provinces from colonization by the other two departments. It is within the judicial province to carefully exercise this power without deference to the other branches, and it is the duty of our department to carry out this obligation without regard to whether the results are perceived to be either beneficial or detrimental to judicial interests or other sub-constitutional interests such as what we (or any other government official) decide is "practicable" or "efficient."

Following these principles, I have no difficulty whatsoever concurring with the result reached by the majority today. Our constitution expressly and unambiguously dedicates the power to administer the judicial branch to the Supreme Court. Kan. Const. art. 3, § 1. This power to administer cannot be shared and is exclusively part of the judicial power in this state. Deciding who, within any particular judicial district, shall be the chief administrative officer is plainly within the administrative power granted to the Supreme Court.

Therefore, the exercise of legislative power to control or dictate in any manner the exercise of judicial administration cannot survive constitutional scrutiny. See *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. ___, ___, 135 S. Ct. 1932, 1962, 191 L. Ed. 2d 911 (2015) (Thomas, J., dissenting) ("[E]ven when acting pursuant to an enumerated power" the legislature "exceeds its authority when it purports to authorize a person or entity to perform a function that requires the exercise of a power vested elsewhere."). This conclusion necessarily encompasses not just K.S.A. 2014 Supp. 20-329 setting forth the manner of appointment of chief judges, but also the creation of the position of chief judge, L. 1999, ch. 57, sec. 17, the assignment of administrative duties to the chief judge,

L. 1976, ch. 146, sec. 28; L. 1999, ch. 57, sec. 17, and the conferral of benefits on the chief judge, K.S.A. 2014 Supp. 75-3120g.

CONCLUSION

To any who may complain (either today or at a later time when some other ox is being gored) that the strict sequestering of governmental power here proposed is unworkable in today's complex society—impractical; inefficient; subject to abuse; or antiquated—we must respectfully answer with the "truism that constitutional protections have costs." *Coy v. Iowa,* 487 U.S. 1012, 1020, 108 S. Ct. 2798, 101 L. Ed. 2d 857 (1988). "A system of separate and coordinate powers necessarily involves an acceptance of exclusive power that can theoretically be abused. . . . While the separation of powers may prevent us from righting every wrong, it does so in order to ensure that we do not lose liberty." *Morrison*, 487 U.S. at 710-11 (Scalia, J., dissenting).

At the end of the day, this is the fact that cannot—must not—be forgotten. Constitutional limits enforced under the protective umbrella of the rule of law derive their ultimate authority from the political power of the people and exist for the protection and propagation of liberty under the law. Each department of government has been vested with unique and exclusive powers to effectuate orderly government—and each has a coordinate and co-equal obligation to exercise its powers with due respect for the powers vested in the other branches. "The Judiciary—no less than the other two branches—has an obligation to guard against deviations from those principles." *Perez*, 135 S. Ct. at 1217 (Thomas, J., concurring). Anything less threatens liberty with the specter of dangerous combinations of power—the prevention of which remains vital to the future of constitutional government.